[No. A122264. First Dist., Div. Five. June 26, 2009.]

CHARISMA R., Plaintiff and Appellant, v.
KRISTINA S., Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts IV. and V.

## Counsel

Squire, Sanders & Dempsey, Amy E. Rose, Robert J. Guite and Jason M. Richardson for Plaintiff and Appellant.

Liberty Counsel and Mary E. McAlister for Defendant and Appellant.

## Opinion

**SIMONS, Acting P. J.**—Charisma R. (Charisma) and Kristina S. (Kristina) were a same-sex couple who began dating in July 1997, moved in together in August 1998, and registered as domestic partners with the State of California in January 2002.[1] In December 2001, the couple decided they wanted to have children and Kristina would be the first to try to become pregnant. Following

---

[1] In order to protect the confidentiality of the minor child, we refer to the parties by their first names. (*Kristine H. v. Lisa R.* (2005) 37 Cal.4th 156, 160, fn. 1 [33 Cal.Rptr.3d 81, 117 P.3d 690].)

several months of effort, Kristina became pregnant by artificial insemination and gave birth to Amalia in April 2003. In July 2003, Kristina moved out of the home she shared with Charisma, taking Amalia with her. Kristina appeals from the trial court's orders declaring Charisma a presumed parent of Amalia and establishing a schedule for reunification of Charisma and Amalia. Among other things, we reject Kristina's contentions that Charisma did not parent Amalia for a sufficient period of time to be declared a presumed parent under Family Code section 7611, subdivision (d) (hereafter section 7611(d)),[2] and we hold Kristina has not shown the trial court's orders violate her constitutional rights to equal protection and due process. In a cross-appeal, Charisma contends the court misunderstood the scope of its authority with respect to allocation of her travel expenses for the reunification process. The cross-appeal has merit. We affirm the trial court's orders except as to allocation of the travel expenses, which we reverse and remand to provide the court an opportunity to exercise its discretion.[3]

## BACKGROUND

After deciding they wanted children, Charisma and Kristina contacted a sperm bank, jointly filled out the required paperwork to obtain sperm from an anonymous donor, and pursued their goal of Kristina becoming pregnant through in-home artificial insemination. Charisma assisted Kristina in the insemination process. The couple kept a joint journal regarding the process, in which Kristina was referred to as "mommy" and Charisma was referred to as "momma."

After five months of attempts at in-home insemination, Charisma ordered two additional vials of sperm in early July 2002. On the evening of July 8, Charisma used one vial to inseminate Kristina at home; the next morning Kristina took the second vial to a doctor who inseminated her through intrauterine insemination. One of these two inseminations resulted in Kristina becoming pregnant.

Amalia was born in April 2003. Charisma was present for the birth and cut the umbilical cord. On the birth certificate, signed by Kristina, Amalia was given a hyphenated last name that was a combination of Charisma's and Kristina's last names. The couple brought Amalia into their home and shared parenting responsibilities for the first six weeks of her life. At that point, Kristina returned to work and Charisma cared for Amalia full time during the day; she also provided care at night.

---

[2] All further undesignated section references are to the Family Code.

[3] On December 15, 2008, Charisma filed a motion for sanctions against Kristina on the ground Kristina's appeal is frivolous. That motion is denied.

In July 2003, approximately seven weeks after Kristina returned to work, she moved out of the home she shared with Charisma, taking Amalia with her. Since then, and before the trial court ordered reunification in 2008, Kristina allowed Charisma to see Amalia on only two occasions in the summer of 2003. In the summer of 2005, Kristina moved to Texas with Amalia.[4]

In May 2004, Charisma filed a petition to establish a parental relationship with Amalia. The trial court denied the petition, concluding that Charisma lacked standing to bring the action under the Uniform Parentage Act (UPA) (§ 7600 et seq.). (*Charisma R. v. Kristina S.* (2006) 140 Cal.App.4th 301, 303 [44 Cal.Rptr.3d 332] (*Charisma I*).) Charisma appealed, and this court reversed in June 2006, concluding that Charisma had standing to establish parentage under the UPA despite the fact that she lacked a biological relationship to Amalia. (*Charisma I*, at pp. 303–304, citing *Elisa B. v. Superior Court* (2005) 37 Cal.4th 108, 119–120 [33 Cal.Rptr.3d 46, 117 P.3d 660] (*Elisa B.*).) Because the trial court did not have the benefit of the *Elisa B.* decision at the time of its initial ruling, this court remanded the matter to the trial court for a determination, in light of *Elisa B.*, whether Charisma is a presumed parent under section 7611(d) and, if so, whether this is an appropriate case in which to rebut the parentage presumption. (*Charisma I*, at pp. 304, 307.)

On remand, the trial court found that Charisma is a presumed parent and that the presumption had not been rebutted. The court appointed custody evaluators who reported that adoption of a reunification plan would be appropriate. In May 2008, the court adopted a plan for gradual reunification of Charisma and Amalia through joint therapy sessions in Texas with a court-appointed therapist.

## DISCUSSION

I. *Substantial Evidence Supports the Trial Court's Finding That the Section 7611(d) Parentage Presumption Is Applicable*

■ Under the UPA, an "interested person" may bring an action to determine the existence or nonexistence of a mother and child relationship. (§ 7650, subd. (a).) Section 7611(d) provides that a man is presumed to be the father of a child if he "receives the child into his home and openly holds out the child as his natural child." As explained in *Adoption of Michael H.* (1995)

---

[4] Kristina also terminated her domestic partnership with Charisma in July 2003, rendering inapplicable section 297.5, subdivision (d), which gives domestic partners rights and responsibilities with respect to each other's children. (§ 299.3, subd. (a); see also *K.M. v. E.G.* (2005) 37 Cal.4th 130, 153 [33 Cal.Rptr.3d 61, 117 P.3d 673] (dis. opn. of Werdegar, J.).)

10 Cal.4th 1043, 1050–1051 [43 Cal.Rptr.2d 445, 898 P.2d 891], "An unwed father's rights and duties . . . substantially depend on whether he is a 'presumed father' within the meaning of section 7611. [Citations.] . . . [T]o become a presumed father, a man who has neither married nor attempted to marry his child's biological mother must not only openly and publicly admit paternity, but must also *physically* bring the child into his home." (See also *In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1652 [56 Cal.Rptr.2d 524] (*Spencer W.*).) In *Elisa B., supra,* 37 Cal.4th at pages 119–120, 125–126, the court held that a biological mother's former same-sex partner may be declared a presumed parent under a gender-neutral application of section 7611(d). (See also *Charisma I, supra,* 140 Cal.App.4th at p. 304.)

In *Elisa B.,* the El Dorado County District Attorney filed a complaint to establish that Elisa was the parent of twins born to her former partner, Emily, and to order Elisa to pay child support. Elisa denied she was the children's parent. (*Elisa B., supra,* 37 Cal.4th at p. 113.) It was undisputed that Elisa participated in the artificial insemination of Emily with the understanding that they would raise the resulting child or children as coparents, and they did in fact coparent the children in a common family home for over one and one-half years. (*Id.* at pp. 114–115, 122.) The court pointed out that section 7650, subdivision (a), states that provisions applicable to determining a father and child relationship shall be used to determine a mother and child relationship " 'insofar as practicable,' " and concluded Elisa could be considered a presumed parent under section 7611(d). (*Elisa B.,* at pp. 119–120.) The case was not "an appropriate action" to rebut the presumption of parentage with evidence that there was no biological relationship between Elisa and the twins,[5] because to allow the presumption to be so rebutted would be contrary to the public policy favoring a child having two parents to provide emotional and financial support. (*Elisa B.,* at pp. 122–125; see also *Charisma I, supra,* 140 Cal.App.4th at pp. 304–307.)

On remand from *Charisma I, supra,* 140 Cal.App.4th 301, Charisma bore the burden of proving she is a presumed parent under section 7611(d) by a preponderance of the evidence. (*Spencer W., supra,* 48 Cal.App.4th at pp. 1652–1653; *Glen C. v. Superior Court* (2000) 78 Cal.App.4th 570, 585–586 [93 Cal.Rptr.2d 103].) On appeal, we review the trial court's determination under the substantial evidence standard: "[W]e are bound to uphold [the trial court's judgment] so long as the record is free from prejudicial error and the judgment is supported by evidence which is 'substantial,' that is, of ' "ponderable legal significance," ' ' "reasonable in nature, credible, and of solid value . . . ." ' [Citations.]" (*Howard v. Owens Corning*

---

[5] Section 7612, subdivision (a), provides that "a presumption under Section 7611 is a rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing evidence."

(1999) 72 Cal.App.4th 621, 631 [85 Cal.Rptr.2d 386].) "Under that standard, we must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the judgment. [Citations.] [¶] It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact. Our authority begins and ends with a determination as to whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, in support of the judgment. Even in cases where the evidence is undisputed or uncontradicted, if two or more different inferences can reasonably be drawn from the evidence this court is without power to substitute its own inferences or deductions for those of the trier of fact, which must resolve such conflicting inferences in the absence of a rule of law specifying the inference to be drawn. We must accept as true all evidence and all reasonable inferences from the evidence tending to establish the correctness of the trial court's findings and decision, resolving every conflict in favor of the judgment. [Citations.]" (*Id.* at pp. 630–631.)

## A. *Kristina's Evidentiary Objections*

Kristina objected below to aspects of declarations filed by Charisma, on the grounds of lack of personal knowledge and lack of foundation. However, the trial court never ruled on her objections. Where a party fails to obtain a ruling from the trial court, the objections generally are not preserved on appeal. (*Bussard v. Minimed, Inc.* (2003) 105 Cal.App.4th 798, 801, fn. 1 [129 Cal.Rptr.2d 675].) Appellate courts sometimes decline to apply that rule where the party unsuccessfully pressed for a ruling below, but Kristina failed to do so in this case.[6] (See *Siam v. Kizilbash* (2005) 130 Cal.App.4th 1563, 1580 [31 Cal.Rptr.3d 368] [party orally requested a ruling and obtained "a blanket ruling of sorts"]; *City of Long Beach v. Farmers & Merchants Bank* (2000) 81 Cal.App.4th 780, 785 [97 Cal.Rptr.2d 140] [party made two oral requests for rulings].) Citing *Thomas v. Quintero* (2005) 126 Cal.App.4th 635 [24 Cal.Rptr.3d 619], Kristina argues this court may consider her objections even though she failed to obtain a ruling below. However, that case held only that reviewing courts may consider evidentiary objections for the first time on appeal where the lower court "disposed of the motion on a legal ground not requiring a consideration of the evidence presented." (*Id.* at p. 656.) The court acknowledged the general rule that a party forfeits objections to evidence where the party fails to obtain a ruling from the trial court. (*Id.* at p. 655.) Because the trial court actually and necessarily considered the evidence presented, Kristina's objections have been forfeited.

---

[6] Kristina asserts she asked the trial court for a written ruling at the December 2006 hearing. In fact, her counsel simply asked whether there would be a written ruling regarding the court's findings in general; there was no specific request related to the evidentiary objections.

In any event, the specific evidentiary objections asserted on appeal are either without merit or relate to evidence unnecessary to support the trial court's judgment. Kristina argues there is no basis to conclude she authored or authorized a birth announcement e-mail, but the announcement is relevant to show that Charisma held out Amalia as her child, regardless of Kristina's participation or knowledge. Kristina argues there was inadequate foundation to admit various e-mails and postings from Internet chat rooms, mostly related to the efforts to conceive Amalia, and that various declarants made assertions about care Charisma provided for Amalia without personal knowledge. However, as discussed below, the record provides overwhelming support for the trial court's findings that Charisma actively participated in Amalia's conception and cared for Amalia following her birth, including averments in Charisma's declaration and Kristina's own admissions. Accordingly, Kristina was not prejudiced by any error in admitting the challenged evidence below.

### B. *Charisma's Claim to Presumed Parent Status Is Not Defeated by the Limited Duration of Her Parenting of Amalia*

Kristina argues that Charisma did not parent Amalia for a sufficient period of time to satisfy section 7611(d).

■ Whether section 7611(d) requires Charisma to show she parented Amalia for an extended duration is a question of statutory interpretation we decide de novo. (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856].) The primary objective in statutory interpretation is to determine and give effect to the underlying legislative intent. (Code Civ. Proc., § 1859.) We begin by examining the statutory language, giving the words their usual, ordinary meanings and, if possible, giving each word and phrase significance. (*Curle v. Superior Court* (2001) 24 Cal.4th 1057, 1063 [103 Cal.Rptr.2d 751, 16 P.3d 166]; *Young v. Gannon* (2002) 97 Cal.App.4th 209, 223 [118 Cal.Rptr.2d 187].) "If the terms of the statute are unambiguous, we presume the lawmakers meant what they said, and the plain meaning of the language governs." (*Estate of Griswold* (2001) 25 Cal.4th 904, 911 [108 Cal.Rptr.2d 165, 24 P.3d 1191].) ■ Section 7611(d), read gender neutrally (*Charisma I, supra,* 140 Cal.App.4th at p. 304), provides that a man or woman is presumed to be a natural parent of a child if "[he or she] receives the child into [his or her] home and openly holds out the child as [his or her] natural child." On its face, the statute contains no durational requirement; it does not, for example, state that the child must be received or held out "for a significant period of time."

Without deciding the issue before this court, prior decisions have addressed the durational issue in defining the term "receives." The use of "receives" in section 7611(d) has its origins in Civil Code former section 230, which addressed the adoption of an illegitimate child by the father. That section provided: "The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth." (Civ. Code, former § 230, repealed by Stats. 1975, ch. 1244, § 8, p. 3196.) When the Legislature enacted the UPA in 1975, it replaced the concept of legitimacy with the concept of parentage and replaced Civil Code former section 230 with the language now in section 7611(d). (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 827–828 [4 Cal.Rptr.2d 615, 823 P.2d 1216] (*Kelsey S.*).)[7]

The court in *Kelsey S.* addressed the "receiving" requirement, both pre-UPA and post-UPA. In that case, the alleged father[8] did not physically receive the child into his home because the birth mother sought to put the child up for adoption. (*Kelsey S., supra,* 1 Cal.4th at p. 825.) The court considered the alleged father's argument that "constructive receipt [of the child] is sufficient when the mother prevents actual receipt." (*Id.* at p. 828.) The court rejected that argument as a matter of statutory interpretation, because the plain language of the statute contemplates "actual" receipt rather than "attempted receipt or constructive receipt." (*Id.* at pp. 826, 830.) In the course of its analysis, the court discussed a pre-UPA case, *In re Richard M.* (1975) 14 Cal.3d 783 [122 Cal.Rptr. 531, 537 P.2d 363], which suggested that constructive receipt might be sufficient. (*Kelsey S.,* at pp. 827–828.) *Kelsey S.* declined to adopt that suggestion, pointing out that in *Richard M.* the father "had in fact received the child into his home, albeit briefly. The court therefore was not faced with the question before us, i.e., whether constructive receipt is sufficient when the mother prevents actual receipt." (*Kelsey S.,* at p. 828.)

---

[7] *Kelsey S., supra,* 1 Cal.4th 816, involved Civil Code former section 7004, subdivision (a)(4) (added by Stats. 1975, ch. 1244, § 11, p. 3196 and repealed by Stats. 1993, ch. 219, § 63, p. 1579), which was identical to section 7611(d). Civil Code former section 7004 was repealed and replaced by Family Code sections 7611, 7611.5 and 7612 without substantive change. (See *Steven W. v. Matthew S.* (1995) 33 Cal.App.4th 1108, 1116, fn. 3 [39 Cal.Rptr.2d 535].)

[8] "A man who may be the father of a child, but whose biological paternity has not been established, or, in the alternative, has not achieved presumed father status, is an 'alleged' father. [Citation.]" (*In re Zacharia D.* (1993) 6 Cal.4th 435, 449, fn. 15 [24 Cal.Rptr.2d 751, 862 P.2d 751].)

*Kelsey S.* also pointed out that under the pre-UPA scheme there was a policy of liberal construction in favor of finding legitimation, so that children did not end up without a legal father. (*Kelsey S., supra,* 1 Cal.4th at pp. 828–829.) The court stated there was no need to "strain[]" to find a father through the doctrine of constructive receipt because in the case before it there were two competing fathers, so the child would end up with a legal father in any event. (*Ibid.*) Although the court declined to liberally construe the requirement in the case before it,[9] the court did not suggest that actual receipt of a child *for a significant duration* is required. To the contrary, the court discussed *Michael U. v. Jamie B.* (1985) 39 Cal.3d 787 [218 Cal.Rptr. 39, 705 P.2d 362], in which the biological father sought *temporary* custody of the child in order to establish his presumed parentage claim. The court favorably quoted the decision as follows: " 'Michael is a natural father, not a presumed father, because he has not yet received Eric [the child] into his home. [Citation.] If, however, he actually acquired physical custody, he could receive Eric into his home and thereby acquire the status of a presumed father. [Citations.] . . . Thus the present controversy, although nominally about the temporary custody of Eric pending the adoption proceeding, will probably determine the fate of the proposed adoption.' " (*Kelsey S.*, at p. 829, quoting *Michael U.*, at p. 791; see also *Kelsey S.*, at p. 842 [stating that the superior court had "the authority to grant petitioner custody of his child so that he could qualify as a presumed father"].) The clear implication is that the "receiving" requirement is a necessary formality, but not one that requires "receipt" for any particular duration.

▆ Moreover, as previously mentioned, the use of the term "receives" in section 7611(d) originates in the use of the term "receiving" in Civil Code former section 230. As *Kelsey S.* explained, under the pre-UPA cases it was sufficient if the alleged father "briefly" received the child into the home. (*Kelsey S., supra,* 1 Cal.4th at pp. 827–828.) We presume the Legislature was aware of the judicial interpretations of the receiving element at the time it adopted the UPA. (*People v. Harrison* (1989) 48 Cal.3d 321, 329 [256 Cal.Rptr. 401, 768 P.2d 1078] [The Legislature "is deemed to be aware of statutes and judicial decisions already in existence, and to have enacted or amended a statute in light thereof. [Citation.] Where a statute is framed in language of an earlier enactment on the same or an analogous subject, and that enactment has been judicially construed, the Legislature is presumed to have adopted that construction. [Citation.]"].) If the Legislature had intended to require an alleged parent to live with a child for an extended period of time, it would likely have used a different term than "receives" or added an express durational requirement. But Kristina presents no analysis of the

[9] We need not decide whether liberal construction would be appropriate in the present case, where Amalia will be left without a second legal parent if Charisma is not a presumed parent.

statutory language or legislative history supporting a conclusion that the Legislature intended so fundamental a change.

None of the cases Kristina cites suggests section 7611(d) imposes a durational requirement to obtain presumed parent status. In *Brian C. v. Ginger K.* (2000) 77 Cal.App.4th 1198, 1219–1221 [92 Cal.Rptr.2d 294], two men had competing claims for presumed father status; the court referred to the duration of one man's parenting, but did not suggest there is a durational requirement. *County of Los Angeles v. Sheldon P.* (2002) 102 Cal.App.4th 1337, 1344–1345 [126 Cal.Rptr.2d 350], also referred to the duration of one man's parenting in comparing two alleged fathers. The court in *Miller v. Miller* (1998) 64 Cal.App.4th 111 [74 Cal.Rptr.2d 797] did not emphasize the duration of parenting in applying section 7611(d). In that case, a man was denied presumed parent status because he had not clearly held the child out as his own and because there was a conclusive presumption that the mother's former husband was the father. (*Miller*, at pp. 118–119.) In *Spencer W., supra*, 48 Cal.App.4th 1647, the man seeking presumed father status was "equivocal in asserting his parental relationship" and left the home once the mother stopped supporting him. (*Id.* at pp. 1651, 1653–1654.) In *In re T.R.* (2005) 132 Cal.App.4th 1202 [34 Cal.Rptr.3d 215], the man seeking presumed father status was found to have molested the child. (*Id.* at pp. 1211–1212.) The court in *In re Nicholas H.* (2002) 28 Cal.4th 56, 70 [120 Cal.Rptr.2d 146, 46 P.3d 932], addressed rebuttal of the parentage presumption, not the requirements of section 7611(d).

*In re A.A.* (2003) 114 Cal.App.4th 771, 786 [7 Cal.Rptr.3d 755], does characterize cohabitation for a period of "one to three months" as "exceedingly small," but it does not suggest that section 7611(d) contains a durational requirement. Instead, the court reversed the trial court's presumed parenthood finding because the evidence supporting the finding was "secondhand," the minor did not live with or visit the alleged father in the man's own home, and there was little evidence the man held himself out as the minor's father. (*In re A.A.*, at pp. 786–787.) Moreover, *In re A.A.* ultimately adopted an expansive interpretation of the "receives" requirement, in holding the trial court erred in refusing to find a second man a presumed father, even though the minor never actually lived with the man. The court reasoned: "The record is clear that the minor never actually lived with R.B. However, when a mother and father of a child are not inclined to live with each other, their child often lives with only one of the parents and visits the other. . . . Although the minor was not received into R.B.'s home to live with him on a full-time basis, he was involved with the minor from the very beginning, with Mother's blessing. He took this interest in the minor even though he was not convinced she is his biological daughter. Thus, when his own son, R., came to visit him, so also did the minor child, whom the record shows was bonded with R." (*Id.* at p. 784.)

Lacking authority supporting her interpretation, Kristina essentially asks us to "judicially rewrite the statute" to impose a durational requirement that is absent from the plain language of section 7611(d); that we cannot do. (*Kelsey S., supra*, 1 Cal.4th at p. 830.) We conclude that receipt of the child into the home must be sufficiently unambiguous as to constitute a clear declaration regarding the nature of the relationship, but it need not continue for any specific duration. This conclusion is consistent with the public policy favoring a child having two parents to provide emotional and financial support, which prior courts have emphasized in interpreting the UPA. (*Elisa B., supra*, 37 Cal.4th at p. 123; see also *Librers v. Black* (2005) 129 Cal.App.4th 114, 123 [28 Cal.Rptr.3d 188] ["whenever possible, a child should have the benefit of *two* parents to support and nurture him or her"].) Although cohabitation for an extended duration may strengthen a claim for presumed parent status, section 7611(d) does not require that cohabitation or coparenting continue for any particular period of time.[10]

C. *Substantial Evidence Supports the Trial Court's Findings That Charisma Received Amalia into Her Home and Openly Held out Amalia As Her Natural Child*

In addition to arguing that Charisma did not parent Amelia for a sufficient duration, Kristina more generally challenges the sufficiency of the evidence to support the trial court's findings that Charisma received Amalia into her home and openly held out Amalia as her natural child, as required to establish presumed parentage under section 7611(d).

As relevant to the "receives" element, after Amalia's birth in April 2003, Charisma and Kristina brought Amalia into their apartment and shared parenting responsibilities for the first six weeks of her life. For the next seven weeks, Charisma cared for Amalia full time during the day, and also provided care at night. Kristina seems to suggest that the apartment was not Charisma's home because there is no evidence both of their names were on the lease. However, she presents no authority or reasoned argument that Charisma

---

[10] Because Charisma received Amalia into her home within the meaning of section 7611(d), we need not address Charisma's argument that section 7611(d) would violate her constitutional rights to the extent it allowed Kristina to prevent Charisma from becoming a presumed parent where Charisma has demonstrated as well as she can under the circumstances a full commitment to her parental responsibilities. (See *Kelsey S., supra*, 1 Cal.4th at pp. 837, 844, 849; *In re Jerry P.* (2002) 95 Cal.App.4th 793, 812–817 [116 Cal.Rptr.2d 123].) And we need not consider whether Kristina should be precluded under the doctrine of equitable estoppel from relying on the limited duration of cohabitation to defeat Charisma's claim to presumed parental status. (See *Kelsey S.*, at p. 853 (conc. & dis. opn. of Mosk, J.); see also *Rodney F. v. Karen M.* (1998) 61 Cal.App.4th 233, 241 [71 Cal.Rptr.2d 399].) Future courts may be confronted with these issues if a birth mother has prevented an alleged parent from satisfying the requirements of section 7611(d), but we are not.

needed to present such proof to satisfy section 7611(d). Substantial evidence shows the apartment was Charisma's home: Kristina in her declaration averred they shared an apartment for almost five years and the apartment was "our common residence"; Charisma referred to the apartment as their "shared" home and averred they obtained renter's insurance in both their names; and the apartment manager averred they lived there together. Kristina disputes the amount and quality of Charisma's care of Amalia and contributions to the household. But, as the trial court reasoned, "there may be disagreements or discrepancies between the parties as to how much care was given by [Charisma] or the quality of that care. The court does not particularly find that to be relevant in terms of whether or not she, in fact, received the child into her home. It is clear to the court from the evidence that was submitted that [Charisma] did care for the child after the child was born."[11]

The following evidence showed that Charisma openly held Amalia out as her natural child:[12] Charisma was present during Amalia's birth and cut the umbilical cord; she gave Amalia a hyphenated last name including her name on Amalia's birth certificate; she brought Amalia into her and Kristina's shared home; she held herself out as Amalia's mother in a birth announcement, a baby shower, a gift registry, an online message board for women trying to conceive, and communications with various people, including the nurse at a "well baby" visit, a visiting former coworker, and strangers in the street; she shared in the care of Amalia until Kristina went back to work; and she cared for Amalia after Kristina returned to work until Kristina moved out with Amalia.

Clearly, Kristina is mistaken in asserting the evidence showed only that Charisma "told a few people that [Amalia] was 'her baby.' " The evidence showed that Charisma openly and publicly asserted her parentage in various forums and to numerous people. Kristina points to no evidence demonstrating any equivocating on the part of Charisma regarding her parentage (cf. *Spencer W., supra*, 48 Cal.App.4th at pp. 1651, 1653–1654), and she presents no authority or reasoned argument that any particular number or sorts of public acknowledgements are necessary to satisfy section 7611(d).

---

[11] Charisma's averments on this issue are corroborated in part by a declaration from the apartment manager who had personal knowledge of the care provided by Charisma during the day because she visited with Charisma and Amalia in her apartment after Kristina returned to work.

[12] Notably, Charisma's lack of biological connection to Amalia does not mean that she could not hold Amalia out as her "natural" child. (*Elisa B., supra*, 37 Cal.4th at p. 126 [" 'natural' as used in the UPA does not always mean 'biological' "].) Kristina does not argue to the contrary.

Instead of discussing the particular facts showing that Charisma received Amalia into her home and held her out as her natural child, Kristina argues broadly that Charisma failed to present sufficient evidence of a parental relationship to qualify as a presumed parent under section 7611(d). She cites *In re T.R.*, where the court stated: "In determining whether a man has 'receiv[ed] a child into his home and openly h[eld] out the child' as his own [*citation*], courts have looked to such factors as whether the man actively helped the mother in prenatal care; whether he paid pregnancy and birth expenses commensurate with his ability to do so; whether he promptly took legal action to obtain custody of the child; whether he sought to have his name placed on the birth certificate; whether and how long he cared for the child; whether there is unequivocal evidence that he had acknowledged the child; the number of people to whom he had acknowledged the child; whether he provided for the child after it no longer resided with him; whether, if the child needed public benefits, he had pursued completion of the requisite paperwork; and whether his care was merely incidental. [*Citations.*]" (*In re T.R., supra*, 132 Cal.App.4th at p. 1211.) *In re T.R.* does not require an alleged parent to show each and every one of these factors exists. Instead, it lists the types of factors trial courts may consider. In this case, the trial court considered the appropriate factors in determining that Charisma is a presumed parent and there was ample evidence of a parental relationship between Charisma and Amalia to support the trial court's determination.[13]

Kristina's attempt to analogize this case to *Spencer W.* fails. In that case, the alleged father, Leonard, lived with the mother at the time of the birth but not at the time of conception. (*Spencer W., supra*, 48 Cal.App.4th at p. 1650.) It was unclear who the biological father was because the mother was a prostitute at the time of conception. (*Ibid.*) Leonard was present at the child's birth, and lived with the child and the mother for two years. (*Ibid.*) During that time, Leonard told some people he was the father, the child called him "daddy," and Leonard cared for and disciplined the child. (*Id.* at pp. 1650–1651.) However, Leonard did not have his name placed on the birth certificate and he "was equivocal in asserting his parental relationship" while they lived together. (*Ibid.*) In particular, when a social worker visited the apartment, Leonard specifically told the worker he was not the child's father. (*Id.* at p. 1651.) He cared for the child for two months while the mother was incarcerated, but when the mother stopped receiving welfare payments during another period of incarceration, Leonard separated from her and left the child with a friend of the mother. (*Ibid.*) The Court of Appeal affirmed the trial court's rejection of Leonard's presumed parentage claim, concluding that

---

[13] Kristina's citations to *Michelle W. v. Ronald W.* (1985) 39 Cal.3d 354 [216 Cal.Rptr. 748, 703 P.2d 88], *Dawn D. v. Superior Court* (1998) 17 Cal.4th 932 [72 Cal.Rptr.2d 871, 952 P.2d 1139] (*Dawn D.*), and *Brian C. v. Ginger K., supra*, 77 Cal.App.4th 1198 are inapposite. In each case the court was confronted with two competing fatherhood claims.

"[t]he evidence permitted the conclusion that Leonard did not receive the child into *his* home, but instead that mother permitted Leonard to reside in *her* home, and that Leonard's residence with [the child] was not demonstrative of Leonard's commitment to the child but reflected that Leonard acted out of personal convenience and self-interest." (*Id.* at p. 1653.) The court also concluded that "a trier of fact could conclude Leonard's actions, as a whole, were not sufficient to satisfy the requirement that Leonard *'openly and publicly* admit paternity.' [Citation.]" (*Id.* at pp. 1653–1654.) The present case is unlike *Spencer W.* The record overwhelmingly supports the trial court's findings that Charisma welcomed Amalia into her shared home with Kristina and consistently acknowledged her parental relationship and responsibilities to the child.

We also reject Kristina's attempt to analogize this case to *In re Sarah C.* (1992) 8 Cal.App.4th 964 [11 Cal.Rptr.2d 414] (*Sarah C.*). There, the child was the product of an extramarital affair between the mother and the alleged father, Paul. (*Id.* at p. 969.) Although Paul told "a few friends" and family that he was the biological father, he did not assist the mother during the pregnancy, did not seek to have his name listed on the birth certificate (which listed the mother's husband's name), and did not inform the mother's husband of the child's biological paternity. (*Id.* at pp. 972–973.) The Court of Appeal concluded the evidence supported the trial court's finding that Paul was not a presumed father. (*Id.* at p. 973.) In contrast, the evidence in this case uniformly showed Charisma held Amalia out as her natural child at every appropriate opportunity.

It is important to note that in the two cases Kristina principally relies upon, *Spencer W.* and *Sarah C.*, the Courts of Appeal were reviewing trial court decisions *rejecting* presumed parentage claims. (*Spencer W., supra,* 48 Cal.App.4th at pp. 1653–1654; *Sarah C., supra,* 8 Cal.App.4th at p. 973.) Accordingly, the reviewing courts were obliged to make all inferences in favor of the trial court findings that the alleged fathers had *not* established their presumed parentage claims. In this case, we are obliged to make all factual inferences in favor of the trial court's finding that Charisma made the showing required by section 7611(d). That finding is amply supported by the evidence in the record.[14]

---

[14] It is frivolous for Kristina to assert that extending presumed parent status to Charisma would justify extending such status to babysitters, nannies, or other home caretakers. Among other things, such persons would not have engaged in a joint effort to conceive a child in a committed romantic relationship, would not have their last name attached to the child on the birth certificate, and would not be able to hold themselves out as the child's mother without strenuous objection from the biological mother and her relatives.

## II. The Trial Court Did Not Abuse Its Discretion in Concluding There Is No Basis to Rebut the Parentage Presumption in This Case

■ Section 7612, subdivision (a), provides that "a presumption under Section 7611 is a rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing evidence." Thus, Kristina bore the burden below of rebutting the presumption that Charisma was Amalia's parent with clear and convincing evidence. (*Comino v. Kelley* (1994) 25 Cal.App.4th 678, 685 [30 Cal.Rptr.2d 728].) The determination of whether the presumption has been rebutted is within the discretion of the trial court. (*Elisa B., supra,* 37 Cal.4th at p. 122.)

In an appropriate case, clear and convincing evidence that an alleged parent has no biological tie to the child may defeat presumed parent status. (See *Elisa B., supra,* 37 Cal.4th at p. 120.) In *Elisa B.,* the court concluded the case was "not 'an appropriate action' in which to rebut the presumption of presumed parenthood with proof that Elisa is not the twins' biological parent." (*Id.* at p. 122.) The court stated it was unnecessary to remand to permit the superior court to exercise its discretion because it would have been an abuse of discretion to conclude the presumption could be rebutted because Elisa "actively participated in causing the children to be conceived with the understanding that she would raise the children as her own together with the birth mother, she voluntarily accepted the rights and obligations of parenthood after the children were born, and there are no competing claims to her being the children's second parent." (*Id.* at pp. 122, 125.)

In *Charisma I,* this court instructed the trial court that, if it found Charisma is a presumed parent of Amalia under section 7611(d), it should then determine whether the facts identified in *Elisa B.* on the rebuttal issue are true. We explained: "If the trial court finds that Charisma is a presumed parent and finds true all of the facts outlined in *Elisa B.* on the rebuttal issue, those findings support a conclusion that this is not an appropriate case to allow rebuttal of the presumption of Charisma's parenthood; in other words, the evidence that she has no biological tie to Amalia does not rebut the presumption. Absent other facts justifying rebuttal of the presumption [citation], any other conclusion would be an abuse of discretion. [Citation.]" (*Charisma I, supra,* 140 Cal.App.4th at p. 307.)[15]

---

[15] We also cautioned that "If not all the facts outlined by *Elisa B.* are present, then the trial court should exercise its discretion with regard to the rebuttal issue based on the evidence and arguments. It may be that not all of the facts emphasized in *Elisa B.* are necessary to a finding that the presumption cannot be rebutted by the lack of a biological tie to the child. Or it may be that there are different facts that justify such a finding." (*Charisma I, supra,* 140 Cal.App.4th at p. 307.) The trial court was not confronted with those considerations because it found all the facts outlined by *Elisa B.* present in this case.

## A. *Substantial Evidence Supports the Trial Court's Determination That the* Elisa B. *Factors Are Present in This Case*

The trial court made findings on the *Elisa B.* factors to support its conclusion that Kristina had failed to rebut the presumption of parenthood under section 7611(d).[16] Substantial evidence supports the trial court's finding that Charisma actively participated in Amalia's conception with the understanding she would parent Amalia with Kristina. Charisma and Kristina were in a romantic relationship and registered domestic partners in California at the time Amalia was conceived. After the couple decided to have children, they contacted a sperm bank and jointly filled out the required paperwork to obtain sperm from an anonymous donor. The sperm bank's "Patient Registration Form" lists Kristina as the patient and Charisma as her "Spouse[]/Partner[]," and indicates they are registered domestic partners. The couple provided Charisma's credit card information for billing purposes and both women signed the form. Both Charisma and Kristina signed a consent form for therapeutic insemination and a release form for home insemination. Charisma completed the sperm bank's "Donor Selection Form" listing donor choices and both women's physical characteristics. Charisma placed two of the orders for sperm (there were three orders in total), one of which included the sperm that impregnated Kristina.

For five months, Charisma actively participated in Kristina's in-home artificial insemination efforts.[17] The couple kept a joint journal regarding the process, in which Kristina was referred to as "mommy" and Charisma was referred to as "momma." In the journal both women describe their excitement at the prospect of parenthood. The journal also contains statements such as "We decided to try to inseminate today." In another entry, Charisma describes in detail her effort to learn how to perform the insemination and how she "blundered" the first attempt. After Kristina became pregnant, her mother addressed e-mails to Charisma and Kristina to "the mommies." Charisma communicated with her coworker, a coworker of Kristina's, an online community of other women trying to conceive, and others regarding her and Kristina's efforts to have a child.

---

[16] Kristina does not dispute that there are no competing claims to being Amalia's second parent.

[17] The trial court found it was impossible to determine whether Amalia's conception occurred due to one of the home insemination attempts or due to a final attempt at the doctor's office, because the final home attempt occurred the evening before the doctor's attempt. In the circumstances of this case, it is not important to our analysis whether actual conception occurred during one of the home attempts with Charisma's assistance.

Kristina disregards this overwhelming body of evidence in asserting that "the trial court substantially relied upon statements in emails made and postings from online chat rooms" without evidence of Kristina's authorship. And, despite Kristina's protestations, even these postings are relevant to Charisma's understanding and intentions. Even absent these postings, substantial evidence plainly supports the trial court's finding. As in *Elisa B., supra,* 37 Cal.4th at page 123, Charisma "actively assisted [Kristina] in becoming pregnant with the expressed intention of enjoying the rights and accepting the responsibilities of parenting the resulting" child.

Substantial evidence also supports the trial court's finding that Charisma voluntarily accepted the rights and obligations of parenthood after Amalia was born: She was present during Amalia's birth and cut the umbilical cord; she gave Amalia a hyphenated last name including her name; she brought Amalia into her home; she held herself out as Amalia's mother to various people in various forums; she shared in the care of Amalia until Kristina went back to work; and she cared for Amalia after Kristina returned to work until Kristina moved out with Amalia. Kristina concedes that Charisma "watched" Amalia after she returned to work, but she disputes the amount and quality of Charisma's care and contributions to the household. We must accept the trial court's resolution of this factual dispute. (*Howard v. Owens Corning, supra,* 72 Cal.App.4th at pp. 630–631.)

Again, an underlying theme of Kristina's argument is that the trial court should have found the parentage presumption rebutted because Charisma did not parent Amalia for a long period of time. While the duration of parenting could be relevant to the rebuttal analysis, there is no specific durational requirement. Kristina points out that in *Elisa B., supra,* 37 Cal.4th at pages 114–115, 123, the alleged parent played a substantial parental role for years. However, the court did not suggest it would be appropriate to rebut the parentage presumption solely because there is no lengthy period of parenting. In fact, the court's holding omits any reference to a durational requirement. Of the three factors outlined by the court, only the "voluntarily accepted the rights and obligations of parenthood" factor (*id.* at p. 125) is one in which duration could arguably be of any relevance. But, despite the fact that Elisa had parented the children for years, the Supreme Court elected not to describe the factor with language including a temporal dimension, such as "for a significant period of time."[18] Moreover, it is undisputed that it was Kristina's unilateral conduct in moving out with Amalia that prevented

---

[18] *In re Nicholas H., supra,* 28 Cal.4th 56, *In re Jesusa V.* (2004) 32 Cal.4th 588 [10 Cal.Rptr.3d 205, 85 P.3d 2], and *Steven W. v. Matthew S., supra,* 33 Cal.App.4th 1108, on which Kristina relies, are inapposite on this issue. All precede *Elisa B.* and offer no guidance on the rebuttal factors outlined in the case. Moreover, in *Nicholas H.* the duration of parenting was not important; the court rejected as a matter of statutory interpretation an argument that the alleged father's lack of biological connection to the child necessarily rebutted his parentage

Charisma from parenting Amalia for a longer period of time. Accordingly, this is not a case where the short duration of parenting reflects negatively on an alleged parent's commitment to establishing a parental relationship. The relatively short period that Charisma parented Amalia is not alone a basis to rebut the parentage presumption.[19]

The trial court's decision is well supported by the evidence.

### B. The Trial Court Did Not Abuse Its Discretion in Concluding That No Other Facts Justified Rebuttal of the Parentage Presumption

In *Charisma I, supra*, 140 Cal.App.4th at page 307, this court indicated that rebuttal of the parentage presumption would not be an abuse of discretion, even if all the *Elisa B.* factors are present, if other facts justified rebuttal of the presumption. We cited *In re T.R., supra*, 132 Cal.App.4th at page 1212, in which the court concluded that conduct "antithetical" to the parental role can justify rebuttal of the presumption (*id.* at p. 1211).

Kristina argues the trial court erred in failing to find the presumption rebutted based on a single photograph of Amalia that Charisma posted online. The claimed objectionable photograph is one of dozens included in an online photo album. It depicts a newborn, naked Amalia from the neck down, apparently in the hospital because of the presence of monitors and cords. The baby's genitalia are visible, although the photograph does not emphasize the

---

claim. (*Nicholas H.*, at pp. 58–59.) In *Jesusa V.* and *Steven W.*, the courts discussed the duration of parenting in order to justify recognizing the claim of one alleged father over that of another. (*Jesusa V.*, at pp. 608–609; *Steven W.*, at pp. 1115–1117.)

[19] Kristina asserts a two-year cohabitation standard to establish parentage is adopted in the American Bar Association Model Act Governing Assisted Reproductive Technology (Feb. 2008) section 604 (<http://www.abanet.org/family/committees/artmodelact.pdf> [as of June 26, 2009]) (hereafter Model Act). In fact, the Model Act is consistent with this decision. It provides: "An individual who provides gametes for, or consents to, assisted reproduction by a woman as provided in Section 604 with the intent to be a parent of her child is a parent of the resulting child." (Model Act, § 603.) Section 604 of the Model Act specifies that "an individual who intends to be a parent of a child born by assisted reproduction" should sign a written consent, but that failure to sign such consent does "not preclude a finding of parentage if the woman and the intended parent, during the first two years of the child's life, resided together in the same household with the child and openly held out the child as their own." In light of the trial court's findings, there is no basis to conclude that Charisma would have failed to sign a consent to Kristina's assisted reproduction, had the legal regime embodied in the Model Act been in effect at that time. In fact, Charisma *did* sign the sperm bank's "Patient Consent Form for Therapeutic Insemination," which may be sufficient to render her a parent under section 603 of the Model Act.

genitalia. Kristina also refers in passing to two other photographs posted online, which depict her breastfeeding Amalia; one of Kristina's breasts is partially visible in both photographs. The circumstances of the online posting of the photographs are unclear. In a declaration, Charisma averred that she and Kristina jointly agreed to create an online photo album after the birth of Amalia, and that album was "the only place where we kept on-line photos of Amalia." The link to the album was shared only with family and friends, although others could find it if they searched by name.[20] Kristina averred that she was upset when she learned that the photographs were online and that she contacted the Newark Police Department, which requested that Charisma remove the pictures from the Internet. Charisma complied. The breastfeeding photographs are not graphic and the photograph of Amalia is not child pornography.[21] At most Charisma demonstrated an isolated instance of poor judgment in including those photographs in a large group of appropriate photographs posted online.[22]

The evidence presented by Kristina is not comparable to the evidence justifying rebuttal of the parentage presumption in *In re T.R., supra,* 132 Cal.App.4th 1202. There, the alleged father, Marvin, was a registered sex offender who had been convicted of three counts of lewd conduct with 10-year-old and 13-year-old girls and sentenced to six years in prison. (*Id.* at pp. 1206–1207.) The minor was 10 years old and declared a dependent of the juvenile court based on an allegation that she was at substantial risk of being sexually abused due to Marvin's history of molesting other children and

---

[20] Kristina asserts that Charisma linked to the photograph or album in an online chat room, but the cited portions of the record only reflect the posting on a message board of two unobjectionable photographs.

[21] Kristina's argument that Charisma's conduct is similar to the parents in *In re Ulysses D.* (2004) 121 Cal.App.4th 1092 [18 Cal.Rptr.3d 430], is meritless. There, the juvenile court found the parents had sexually abused their children by taking three photographs, including one in which the nude father appeared in a sexually suggestive situation with one of the children, who was also nude. (*Id.* at pp. 1095–1097.) The photographs at issue were on the same roll of film in which the mother posed in her panties; the photographs of the mother were admittedly taken as foreplay for the parents' sexual arousal. (*Id.* at p. 1097.) The Court of Appeal sustained the juvenile court's finding that the photographs were taken to "arouse themselves or others." (*Ibid.*) The photograph at issue in this case bears no resemblance to those at issue in *Ulysses D.*

[22] Kristina also refers in passing to evidence she presented below suggesting that Charisma did not provide good care to Amalia. In her reply, Kristina specifically refers to a declaration from her mother, in which her mother avers that "one time" she saw Charisma attempt to feed Amalia by putting a tube down her throat and that she saw Charisma yelling angrily at Kristina while holding Amalia. The trial court described this evidence as differences of opinion regarding the quality of care provided by Charisma.

reports of his inappropriate conduct with the minor. (*Ibid.*)[23] The court concluded that, although the parentage presumption may have arisen based on Marvin's acting in a paternal role since the minor was three, the juvenile court did not err in concluding the presumption was rebutted by his conduct. (132 Cal.App.4th at p. 1212.) The court emphasized that Marvin had deceived the minor's mother regarding his criminal convictions and the juvenile court had found true the allegations of molestation by clear and convincing evidence. (*Id.* at p. 1211.) "Marvin's conduct was antithetical to a parent's role and was a blatant violation of parental responsibilities. It more than counterbalanced the factors favoring Marvin's presumed father status." (*Ibid.*) Nothing comparable was presented to the trial court in this case. Kristina has not shown the court erred in rejecting her suggestion to rebut the parentage presumption based on Charisma's alleged unsuitability as a parent.

Finally, Kristina contends extending presumed parent status to Charisma is not consistent with "the purposes of the parentage presumption." Kristina principally relies on *Elisa B., supra,* 37 Cal.4th 108, where El Dorado County was seeking to force the alleged parent to provide financial support to the children. Kristina interprets *Elisa B.* too narrowly; the case does not suggest that lack of a present need for financial support justifies rebuttal of the presumption. The presumption furthers the general public policy favoring a child having "two parents, rather than one, as a source of both emotional and financial support." (*Id.* at p. 123; see also *Kristine H. v. Lisa R., supra,* 37 Cal.4th at p. 166 [referring to "the public policy favoring that a child have two parents rather than one"]; *Kristine M. v. David P.* (2006) 135 Cal.App.4th 783, 788 [37 Cal.Rptr.3d 748] ["[p]ublic policy and common sense endorse, where possible, creation of a legal parent and child relationship, with the attendant responsibilities and privileges" (fn. omitted)]; *Librers v. Black, supra,* 129 Cal.App.4th at p. 123 ["whenever possible, a child should have the benefit of *two* parents to support and nurture him or her"].) It may be especially important to apply the presumption where the public would otherwise bear the support obligation (*Elisa B.*, at p. 123), but that is not a necessary condition to application of the presumption. It is reasonable to conclude Amalia will benefit, either now or in the future, from the additional financial and emotional support a second parent can provide, even if she would not otherwise become a public burden.[24]

---

[23] For example, the minor's older sister observed the minor lying over Marvin's lap with her pants and underwear around her ankles. (*In re T.R., supra,* 132 Cal.App.4th at p. 1206.) The circumstances surrounding the inappropriate conduct were similar to those involved in Marvin's prior criminal offenses. (*Id.* at p. 1207.)

[24] The other cases cited by Kristina, all of which involve the presumption that a man is the father of a child conceived by his wife during the marriage, are inapposite. *In re Lisa R.* (1975) 13 Cal.3d 636, 648–651 [119 Cal.Rptr. 475, 532 P.2d 123], held that a man had a due process right to challenge the presumption, in part because the purposes served by the presumption

Kristina also contends it is inconsistent with the purposes of the presumption to extend presumed parent status to an individual who has not "demonstrated a commitment to creating a substantial familial relationship with a child." Assuming that to be true, the trial court found Charisma *did* demonstrate such commitment, and the court's findings are supported by substantial evidence. Kristina's additional argument that an extended period of parenting is necessary to demonstrate that commitment is not supported by section 7611(d) or the case law, as explained previously.

### III. *Kristina's Constitutional Claims Are Without Merit*

#### A. *This Court Will Exercise Its Discretion to Decide the Constitutional Claims*

In *Charisma I, supra,* 140 Cal.App.4th at page 308, because this court remanded for further factual findings, we declined to address Kristina's claim "that it would violate her federal constitutional rights were we to conclude that Charisma is Amalia's parent under the [UPA]." Although Kristina raised those claims in the previous appeal, she failed to raise them on remand. Charisma contends the constitutional claims have been forfeited. (See, e.g., *Newton v. Clemons* (2003) 110 Cal.App.4th 1, 11 [1 Cal.Rptr.3d 90] [" '[g]enerally, issues raised for the first time on appeal which were not litigated in the trial court are waived' "].) On the other hand, "California courts have held that constitutional issues can be raised for the first time on appeal in various circumstances. [Citations.]" (*Bonner v. City of Santa Ana* (1996) 45 Cal.App.4th 1465, 1476–1477 [53 Cal.Rptr.2d 671] (*Bonner*), disapproved on another ground in *Katzberg v. Regents of University of California* (2002) 29 Cal.4th 300, 320–321 [127 Cal.Rptr.2d 482, 58 P.3d 339].)

Typically, courts exercise their discretion to allow issues to be raised for the first time on appeal when "the issue is purely legal and presented to [the court] on undisputed facts, and involves a matter of public interest . . . ." (*Bialo v. Western Mutual Ins. Co.* (2002) 95 Cal.App.4th 68, 73 [115 Cal.Rptr.2d 3].) In this case, the parties do dispute the facts regarding the conception and parenting of Amalia, and those facts are relevant to Kristina's as-applied challenge to section 7611(d). However, the factual determinations relevant to Kristina's challenge are encompassed within the trial court's

were undermined by the death of the husband and wife. *County of Orange v. Leslie B.* (1993) 14 Cal.App.4th 976, 979–982 [17 Cal.Rptr.2d 797], held the trial court properly declined to apply the presumption where it would allow the biological father to escape his support obligations and the purposes served by the presumption were undermined by the lack of a parental relationship between the child and the mother's former husband. (See also *Comino v. Kelley, supra,* 25 Cal.App.4th at p. 684 [presumption rebutted where there "is neither a marital union nor a family unit to preserve"].)

findings that Charisma is a presumed parent and the presumption should not be rebutted. Accordingly, resolution of the constitutional claims requires only hat we apply the law to the facts found by the trial court; in these circumstances, we have discretion to consider the claims. (See *Hittle v. Santa Barbara County Employees Retirement Assn.* (1985) 39 Cal.3d 374, 391, fn. 10 [216 Cal.Rptr. 733, 703 P.2d 73] [new legal claim properly considered on appeal where relevant evidence was "fully presented to the trial court"]; cf. *People v. Williams* (2008) 43 Cal.4th 584, 625 [75 Cal.Rptr.3d 691, 181 P.3d 1035] [claim forfeited where there is a "critical factual dispute that the trial court never was asked to explore or resolve"].) There is no unfairness to Charisma in considering Kristina's constitutional claims because Charisma already had full opportunity and incentive to develop the relevant factual record. As in *Bonner, supra*, 45 Cal.App.4th at page 1477, "the question is one of pure law presented in a context where . . . the factual situation is no 'different from that established by the evidence in the trial court.' [Citation.]"

Because Kristina's constitutional claims are a matter of substantial public interest in this rapidly evolving area of family law, we exercise our discretion to decide the claims presented by Kristina on appeal in light of the trial court's factual findings.

### B. *Kristina's Equal Protection Claim Is Without Merit*

Kristina contends the trial court's order violates the federal and state constitutional guarantees of equal protection because she was accorded disparate treatment on the basis of gender. "Broadly stated, equal protection of the laws means 'that no person or class of persons shall be denied the same protection of the laws . . . enjoyed by other persons or other classes in like circumstances in their lives, liberty and property and in their pursuit of happiness.' [Citation.] In determining whether such a deprivation has occurred, the court's ultimate task is to examine the validity of the underlying purpose, and the extent to which the disputed statutory classification promotes such purpose. [Citations.]" (*People v. Wutzke* (2002) 28 Cal.4th 923, 943 [123 Cal.Rptr.2d 447, 51 P.3d 310].) "As a foundational matter, however, all meritorious equal protection claims require a showing that 'the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' [Citation.] In other words, 'neither the Fourteenth Amendment of the Constitution of the United States nor the California Constitution [citations] precludes classification by the Legislature or requires uniform operation of the law [for] persons who are different . . . "with respect to the legitimate purpose of the law." ' [Citations.]" (*Id.* at pp. 943–944.)

Kristina's argument she was accorded disparate treatment on the basis of gender rests on two Court of Appeal decisions in which men were denied presumed parent status, *Spencer W., supra,* 48 Cal.App.4th 1647, and *Sarah C., supra,* 8 Cal.App.4th 964. Kristina contends she is "similarly situated to the mothers in those cases" and she "was accorded disparate treatment because of the sex of her ex-partner." (Boldface omitted.)

We have already rejected Kristina's attempt to analogize this case to *Spencer W.* and *Sarah C.* To summarize, in *Spencer W.,* the alleged father did not have his name placed on the birth certificate, he was "equivocal" in acknowledging his paternity, and he abandoned the child when the mother stopped supporting him. (*Spencer W., supra,* 48 Cal.App.4th at pp. 1650–1651.) In *Sarah C.,* the alleged father did not assist the mother during the pregnancy, did not seek to have his name listed on the birth certificate, and did not inform the mother's husband of his paternity claim. (*Sarah C., supra,* 8 Cal.App.4th at pp. 972–973.) For the reasons stated previously, the present case is distinguishable from *Spencer W.* and *Sarah C.*

Kristina has not shown that a similarly situated biological mother opposing a petition to establish presumed parentage would be treated differently under the law if the alleged parent, lacking a biological connection to the child, were a man instead of a woman. In other words, Kristina has not shown that a case involving a man in Charisma's circumstances would be decided any differently under the law. (See *Elisa B., supra,* 37 Cal.4th at p. 129 (conc. opn. of Kennard, J.) [pointing out that a man similarly situated to the nonbiological mother in the case also would have been declared a presumed parent].) Kristina's equal protection claim is without merit.

### C. *Kristina's Due Process Claim Is Without Merit*

Kristina contends the trial court's ruling, declaring Charisma a presumed parent "over [Kristina's] objections as the fit biological mother," violated her federal and state constitutional rights to due process. In particular, citing *Troxel v. Granville* (2000) 530 U.S. 57 [147 L.Ed.2d 49, 120 S.Ct. 2054] (*Troxel*), Kristina contends that recognizing Charisma as a parent violated her fundamental parental right to rear Amalia.

■ In *Troxel,* the United States Supreme Court struck down on due process grounds a visitation order under a Washington statute that allowed " '[a]ny person' to petition a superior court for visitation rights 'at any time' " and authorized the court "to grant such visitation rights whenever 'visitation may serve the best interest of the child.' " (*Troxel, supra,* 530 U.S. at p. 60.) Under the statute, Granville, a single mother, was required to permit her children's paternal grandparents to visit the children on a schedule imposed

by the trial court. (*Id.* at pp. 60–61.) The Supreme Court explained that the Fourteenth Amendment's due process clause[25] not only guarantees fair process but also "includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.' " (*Troxel*, at p. 65; see also *Dawn D., supra*, 17 Cal.4th at pp. 939–940.) The court, in a plurality opinion written by Justice O'Connor, concluded the nonparental visitation order "was an unconstitutional infringement on Granville's fundamental right to make decisions concerning the care, custody, and control of her two daughters." (*Troxel*, at p. 72.)[26]

*Troxel* is inapposite. There, the court considered a nonparental visitation statute (*Troxel, supra*, 530 U.S. at p. 73); at issue here is a statute determining the identity of Amalia's parents. Unlike the order in *Troxel*, the order declaring Charisma a parent of Amalia by definition did not extend rights to a nonparent. Moreover, as in *K.M. v. E.G., supra*, 37 Cal.4th at page 144, neither Charisma's nor Kristina's "claim to parentage preceded the other's." In that case, the California Supreme Court rejected an analogy to *Troxel*, reasoning "K.M.'s claim to be the twins' mother because the twins were produced from her ova is equal to, and arose at the same time as, E.G.'s claim to be the twins' mother because she gave birth to them." (*K.M.*, at p. 144.) In this case, Kristina and Charisma decided to have a child together, they jointly pursued the goal of Kristina becoming pregnant, and Charisma was present at the birth and cut the umbilical cord. Kristina's parentage claim arises from the fact that she gave birth to Amalia. (*Ibid.*; *Elisa B., supra*, 37 Cal.4th at p. 116.) And, at the time of the birth, Charisma had an inchoate parentage claim because she "actively consented to, and participated in, the artificial insemination of her partner with the understanding that the resulting child . . . would be raised by [Kristina] and her as coparents." (*Elisa B.*, at p. 122; see also *id.* at p. 125.) Charisma's parentage claim was not legally complete until she accepted Amalia into her home, but it arose at the same time as Kristina's claim. Because Charisma ultimately satisfied the legal standards for presumed parent status and her showing was not rebutted,

---

[25] The due process clause of the Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." (U.S. Const., 14th Amend., § 1.)

[26] *Troxel* did not hold that the Washington statute was unconstitutional per se or that the due process clause requires "all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation." (*Troxel, supra*, 530 U.S. at p. 73; see also *In re Marriage of Harris* (2004) 34 Cal.4th 210, 223–226 [17 Cal.Rptr.3d 842, 96 P.3d 141].) Instead, the court's plurality emphasized that the Washington statute was "breathtakingly broad," because it permitted a court to "disregard and overturn *any* decision by a fit custodial parent concerning visitation whenever a third party affected by the decision files a visitation petition, based solely on the judge's determination of the child's best interests." (*Troxel*, at p. 67.)

declaring her a parent is not giving parental rights to an unrelated individual; it is recognizing the parental role that existed from birth. (See *Sharon S. v. Superior Court* (2003) 31 Cal.4th 417, 422, 445 [2 Cal.Rptr.3d 699, 73 P.3d 554] [rejecting analogy to *Troxel* in second-parent-adoption context and stating that former same-sex partner with no biological connection to child is not "just 'any person' [citation]; she is a prospective adoptive mother"].)

Although Kristina fails to frame the issue in this fashion, her true complaint is that the state has seen fit to declare a person without a biological connection to Amalia a parent. This involves a different liberty interest than those at issue in *Troxel* and other cases cited by Kristina; in those cases, the identity of the parents was not in dispute. (*Troxel, supra*, 530 U.S. 57; *Stanley v. Illinois* (1972) 405 U.S. 645 [31 L.Ed.2d 551, 92 S.Ct. 1208]; *Prince v. Massachusetts* (1944) 321 U.S. 158 [88 L.Ed. 645, 64 S.Ct. 438].) The distinction is critical because the courts "have required in substantive-due-process cases a 'careful description' of the asserted fundamental liberty interest. [Citations.]" (*Washington v. Glucksberg* (1997) 521 U.S. 702, 721 [138 L.Ed.2d 772, 117 S.Ct. 2258] (*Glucksberg*); see also *Dawn D., supra*, 17 Cal.4th at p. 940.) "This 'careful description' is concrete and particularized, rather than abstract and general . . . ." (*Dawn D.*, at p. 940.)[27] Kristina's claim is essentially that as the biological mother, and in the effective absence of a biological father, she has a fundamental right to decide whether Amalia has a second parent. However, she presents no authority or reasoned argument that a state infringes on a biological parent's substantive due process rights by extending parental status to a nonbiological parent in the circumstances of this case. (See *Michael H. v. Gerald D.* (1989) 491 U.S. 110, 129–130 [105 L.Ed.2d 91, 109 S.Ct. 2333] (plur. opn. of Scalia, J.) [state did not violate biological father's constitutional rights by denying him an opportunity to rebut a presumption that husband of mother was father; "[i]t is a question of legislative policy and not constitutional law whether California will allow the presumed parenthood of a couple desiring to retain a child conceived within and born into their marriage to be rebutted"].) It may be that there are different circumstances in which such an order would be unconstitutional, but any such determination would require a careful analysis of the specific facts and interests involved in the case. (See *Troxel*, at p. 73.)

---

[27] It is not appropriate "to define a fundamental constitutional right or interest in so narrow a fashion that the basic protections afforded by the right are withheld from a class of persons . . . who historically have been denied the benefit of such rights." (*In re Marriage Cases* (2008) 43 Cal.4th 757, 824 [76 Cal.Rptr.3d 683, 183 P.3d 384].) But in this case there are actually two different rights at stake—the right of parents to rear their children and the arguable right of a biological mother to determine whether her child has a second parent. Also, Kristina is not, with respect to the asserted right, a member of a historically deprived class.

Not only has Kristina failed to present relevant authorities and analysis regarding the actual asserted liberty interest at issue, but she fails to address the "complex balancing of competing interests" (*Glucksberg, supra*, 521 U.S. at p. 722) necessary to resolution of substantive due process claims, despite the fact that this court identified some of the potential competing interests in *Charisma I*. There, we pointed out that "a rule that allowed the biological mother to unilaterally deny presumed parent status would potentially implicate the constitutional rights of the person seeking such status [citation] and the constitutional rights of the child in the establishment of the parent-child relationship [citation]." (*Charisma I, supra*, 140 Cal.App.4th at p. 308; see also *Kelsey S., supra*, 1 Cal.4th at p. 849 [holding that it would violate an unwed father's constitutional rights to allow "a mother unilaterally to preclude her child's biological father from becoming a presumed father"].) We also pointed out that "[s]uch a rule would be contrary to the 'public policy favoring that a child has two parents rather than one.' [Citation.]" (*Charisma I*, at p. 308.) Finally, an assessment of the weight of Kristina's interest in denying parental status to Charisma would need to take into account Kristina's own conduct prior to and immediately after Amalia's birth, which led Charisma to understand that she would be a parent.

We point out these competing interests and considerations to elucidate the fallacy of Kristina's simplistic analogy to *Troxel, supra*, 530 U.S. 57, and to demonstrate the complexity of a substantive due process claim based on the actual liberty interest affected by the trial court's order. However, because Kristina has failed to provide citations to authority and reasoned argument regarding the balancing of interests necessary to resolve that due process claim, we deem the argument waived. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 [79 Cal.Rptr.2d 273].) This is particularly appropriate in light of the admonition from the United States Supreme Court that "constitutional protections in this area are best 'elaborated with care.' " (*Troxel*, at p. 73; see also *In re Marriage of Harris, supra*, 34 Cal.4th at p. 228 ["we should be very careful in identifying the scope of the due process interest in parenting"].)

■ We conclude Kristina has failed to meet her burden of showing that the order declaring Charisma to be Amalia's second parent was an unconstitutional infringement of her state and federal rights to substantive due process. (See *Dawn D., supra*, 17 Cal.4th at p. 939 [courts must "always presum[e] the constitutional validity of legislative acts and resolv[e] doubts in favor of the statute"].)

IV., V.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

VI. *Charisma's Cross-appeal*

The court-appointed custody evaluators recommended a gradual process to reestablish Charisma's relationship with Amalia, including joint therapy sessions in Texas with a court-appointed therapist. In its tentative order following the April 2008 trial regarding custody and visitation, the trial court ordered the parties to equally share the costs of the reunification process, including the therapist's fees and Charisma's airfare costs to travel to Texas. After Kristina objected, the court concluded it lacked authority to require Kristina to pay a share of Charisma's travel costs because there was no child support order and Kristina was not technically a "move away" parent. The court also stated that forcing Kristina to bear a portion of the travel costs would be "punitive," which was a reference to Kristina's argument that forcing her to bear a portion of the costs would be a "punitive penalty against" her "exercise of her constitutional right to travel." The court required Charisma to bear 100 percent of the travel costs.

 In her cross-appeal, Charisma contends the trial court erred in concluding it lacked authority to order the parties to share the travel expenses. She argues the court had broad discretion to apportion the costs of visitation in the best interests of the child. We agree. In the proceeding at issue, to determine custody and visitation issues in a UPA action (§ 3021, subd. (f)), the court had "the widest discretion to choose a parenting plan that is in the best interest of the child" (§ 3040, subd. (b)). (See also *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 31 [51 Cal.Rptr.2d 444, 913 P.2d 473] (*Burgess*).) The court was required to consider "*all the circumstances* bearing on the best interest of the minor child." (*Burgess*, at pp. 31–32; see also §§ 3011, 3021, subd. (f).) One relevant consideration was the state policy encouraging frequent visitation. Section 3020, subdivision (b), provides: "The Legislature finds and declares that it is the public policy of this state to assure that children have frequent and continuing contact with both parents after the parents have . . . ended their relationship, and to encourage parents to share the rights and responsibilities of child rearing in order to effect this policy . . . ." Charisma points out that, were she forced to bear the entire financial burden, the cost of airfare could interfere with her ability to frequently visit Amalia in Texas.

In *Burgess, supra*, 13 Cal.4th at page 40, the Supreme Court discussed the trial court's authority to fashion visitation orders, stating "the trial court has

---

*See footnote, *ante*, page 361.

broad discretion to modify orders concerning contact and visitation to minimize the minor children's loss of contact and visitation with the noncustodial parent in the event of a move, e.g., by increasing the amount of visitation with the noncustodial parent during vacations from school, *allocating transportation expenses to the custodial parent*, or requiring the custodial parent to provide transportation of the children to the noncustodial parent's home." (Italics added; see also *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072, 1101 [12 Cal.Rptr.3d 356, 88 P.3d 81] [trial courts must be permitted to "exercise their discretion to fashion orders that best serve the interests of the children in the cases before them"].) Although the quoted text in *Burgess* is phrased in the language of a "move-away" case, in which a parent who has sole physical custody under an existing judicial custody order seeks to relocate, the case actually involved an initial order of custody and visitation. (*Burgess*, at p. 37 & fn. 8.) *Burgess* discussed "move-away" cases in order to broadly clarify the law because "considerations and interests in both types of custody matters are closely interrelated." (*Id.* at p. 37, fn. 8.) Accordingly, *Burgess* does not suggest a court's authority to allocate transportation expenses is limited to "move away" cases. Neither does the decision suggest any such allocation must be made in the context of a child support order.

Kristina, in her briefing on the cross-appeal, does not dispute that the trial court had authority to order the parties to share travel expenses and does not argue that such an order would have violated her constitutional right to travel. Instead, she asserts that the trial court actually exercised its discretion and concluded it would be inappropriate to require Kristina to share the travel costs. That argument is without merit. The court's final order on the issue states that it initially "was inclined to order that [Charisma's] travel costs to Texas be split 50/50, but [Kristina] objected to this provision." The court then noted that the issue sometimes comes up in the context of child support orders and in the context of "move aways." The court concluded: "Here there is no child support order or request for one, and [Kristina] moved away at a time when under the then-current state of the law [Charisma] had no standing to object and the court no power to impose conditions on the move. Under these circumstances, the court concludes that forcing [Kristina] to bear a portion of [Charisma's] travel costs would be 'punitive' and, more importantly, without authority." The order is unambiguous; the trial court concluded it lacked authority to require the parties to share the travel expenses.

We remand for the trial court to exercise its discretion to determine whether, in the best interests of Amalia, the parties should share Charisma's travel costs to Texas for the reunification process.

## DISPOSITION

The trial court's orders are affirmed, except as to allocation of Charisma's travel expenses for the reunification process. On that issue, we reverse and remand with directions that the court exercise its discretion. Costs on appeal are awarded to Charisma.

Needham, J., and Bruiniers, J.,* concurred.

The petition of appellant Kristina S. for review by the Supreme Court was denied September 9, 2009, S175253.

---

*Judge of the Contra Costa Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.