Filed 4/7/14  In re T.D. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re T.D., a Person Coming Under the Juvenile Court Law. | B250228 (Los Angeles County Super. Ct. No. CK73654) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. M.A., Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Elizabeth Kim, Juvenile Court Referee.  Affirmed.

Julie E. Braden, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Peter Ferrera, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

In this dependency appeal, M.A. appeals from the judgment terminating parental rights and selecting adoption as the permanent plan for the child, T.D. During the course of the dependency proceedings, M.A. was identified as the biological or natural father of T.D., but he never achieved presumed father status. T.D.'s mother, J.D., is not a party to this appeal. M.A. contends the court erred in terminating his parental rights without affording him reunification services and without making a finding of parental unfitness or detriment. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

T.D. was born in October 2012. The Los Angeles County Department of Children and Family Services (DCFS) received a referral regarding T.D. on November 1, 2012. The referral alleged mother had an open case with DCFS regarding T.D.'s half sibling, and mother had a mental health condition, the specifics of which were unknown.

A social worker interviewed mother at the hospital on November 1, 2012. Mother confirmed she had a mental health diagnosis and said she was seeing a psychiatrist once a month. Although she identified M.A. as T.D.'s father and gave the social worker M.A.'s phone number, she did not identify him as the father on T.D.'s birth certificate. When the social worker called M.A., he stated he was aware mother had given birth, but he did not have time to go to the hospital. He denied having a relationship with mother. He did not believe T.D. was his son because he had been intimate with mother only a few times, and they had used protection. He stated he would not take care of T.D. unless it was proven T.D. was his son. He requested a paternity test. He then told the social worker "he was a busy man" and she "should just get to the point." The social worker asked M.A. for his date of birth. He became upset and told her to "mind her own business," and then "the line went dead."

That same day, mother left the hospital with her clothing and all her belongings against the advice of the nurses, who informed her she could not leave without the doctor's approval. When she left, she left T.D. at the hospital without an appropriate plan.

On November 2, 2012, the social worker spoke again with M.A. and advised him of the detention hearing date and the court address. M.A. had seen a picture of T.D. and was now sure the baby was not his son. He said he would attend the hearing only to request a paternity test.

Neither mother nor M.A. attended the detention hearing on November 6, 2012. The court detained T.D. based on a petition under Welfare and Institutions Code section 300, subdivisions (b) and (g),[1] alleging mother had a history of mental and emotional problems, including schizophrenia and bipolar disorder; T.D.'s half sibling was receiving permanent placement services due to these and other issues; and mother had left T.D. at the hospital without making a plan for his care and supervision.

At the time of the jurisdiction and disposition report on November 20, 2012, DCFS was unable to locate M.A. The phone number at which the social worker previously contacted him was no longer working. M.A. had not contacted DCFS since T.D. had been detained; thus, visitation had not been arranged. DCFS submitted a declaration of due diligence regarding M.A. DCFS was requesting an order of no reunification services for M.A. pursuant to section 361.5, subdivisions (a) (reunification services required only for mother, statutorily presumed father, or guardians) and (b)(1) (reunification services not required when whereabouts of parent or guardian unknown).

At the adjudication hearing on November 27, 2012, neither mother nor M.A. appeared. The court found the allegations of the petition true and declared T.D. a dependent of the court. In so doing, the court found, by clear and convincing evidence, that placement of T.D. with M.A. would be detrimental to T.D.'s safety, protection, or physical or emotional well-being. The court also found M.A. was not entitled to reunification services: "So the court will make a finding by clear and convincing evidence that the father is a person described by Welfare and Institutions Code 361.5(b)(1) and orders that reunification services not be provided to him. [¶]

---

[1]     Further undesignated statutory references are to the Welfare and Institutions Code.

3

Additionally, he's an alleged father only and is not entitled to reunification services pursuant to 361.5(a)." The court also denied mother reunification services based on other factors and set the matter for a permanency plan hearing on March 18, 2013.

On November 29, 2012, M.A. contacted DCFS and requested a paternity test. Due to the holidays and the social worker's vacation schedule, the social worker did not meet with M.A. until January 15, 2013. At that time, M.A. completed the "Statement Regarding Parentage" form requesting a paternity test, and the social worker provided him notice of the permanency plan hearing. DCFS filed an ex parte application for an order for a paternity test, and the court held a hearing on February 26, 2013. The court appointed a lawyer for M.A. at the hearing. The court ordered M.A. to be available for the paternity test on March 1, 2013. It also ordered monitored visits for M.A. and immediate referrals for parent education and individual counseling. DCFS mailed these referrals to M.A. on February 26.

On March 12, 2013, the court received the results of the paternity test stating there was a 99.9 percent probability M.A. was T.D.'s father. At a hearing on March 18, 2013, the court made a finding that M.A. was the biological father of T.D. The court again ordered monitored visits for M.A. and referrals for parent education, individual counseling, and "what[ever] services [are] needed . . . to obtain presumed father status if appropriate." It ordered DCFS to communicate with M.A. in the next 48 hours about a visitation schedule. The visits were to be at least once a week, and DCFS had discretion to liberalize. In explaining the proceedings to M.A., the court noted: "And to offer you some in[sight] with respect to the process today, we are at what's called a two-six hearing, and that means that in terms of reunification, and looking at the case and the time I have to have [T.D.] returned to parents, that period has already passed. I'm not saying that parental rights are terminated because that's a very different thing. But right now, in terms of where the case is, the focus is no longer at return. There are things that you can do in order to have reunification services addressed and your lawyer can tell you how to go about doing that." The court continued the permanency plan hearing to May 28, 2013, and again to June 3, 2013.

4

On March 25, 2013, M.A. filed a petition pursuant to section 388[2] requesting that the court vacate its order setting a permanency plan hearing and grant further reunification services. The petition indicated M.A. wanted to raise T.D. and stated: "The father is visiting his child and is taking steps in order to facilitate the placement of [T.D.] into his home. In addition, both parents filed the voluntary declaration of paternity which will be filed with the state." In terms of why the new order would be in T.D.'s best interests, it stated: "[T.D.] is a young child, and he has a father who is willing and ready to take him into his home and raise him along side his siblings. When it is possible, it is in the best interest of the child to be with family. [M.A.] is non offending and he wishes to raise his son." The court denied the section 388 petition because the petition did not "state new evidence or a change of circumstances," but made conclusory statements only with no supporting documentation.

M.A. was scheduled to visit T.D. 10 times between March 21 and May 21, 2013. The visits were scheduled for one hour. At the March 21 visit, M.A. told the social worker he had "uncontrollable diabetes and [h]igh blood pressure." At the March 29 visit, M.A. stayed for only half an hour. At the April 1 visit, he also stayed for half an hour. He said he could not stay for the entire hour because he had to get insulin supplies. He appeared visibly ill and was sweating profusely. He also exhibited labored breathing and shaking. M.A. cancelled the visits scheduled for April 16 and 23. He visited on May 1 for only half an hour again. At the May 15 visit, T.D. was crying, and his foster mother prompted M.A.to soothe him by walking around the room with him. M.A.

---

[2]     Section 388 provides in pertinent part: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court or a nonminor dependent as defined in subdivision (v) of Section 11400, or the child himself or herself or the nonminor dependent through a properly appointed guardian may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court or in which a guardianship was ordered pursuant to Section 360 for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." (§ 388, subd. (a)(1).)

walked around the room a few times and then handed T.D. back to the foster mother, saying he was tired.

M.A.'s counsel appeared at the permanency plan hearing on June 3, 2013; M.A. did not. Counsel objected to the termination of M.A.'s parental rights, though he acknowledged M.A. did not "have an argument with regard to the two-six exception[s]."[3] Counsel argued M.A. was the biological father of T.D., he was a nonoffending parent, and the court had never made a detriment finding with respect to M.A.

The court noted DCFS had provided M.A. referrals for services so he could rise to the level of presumed father status, but there was no proof he had completed any of the classes or counseling, even when M.A. filed his section 388 petition. The court found, by clear and convincing evidence, that T.D. was adoptable and it would be detrimental to return him to the parents. It further found no exception to adoption applied and terminated parental rights. M.A. filed a timely appeal from the court's termination order.

## DISCUSSION

### 1. Reunification Services

M.A. contends the court erred when it terminated his parental rights without affording him reunification services. He relies on section 366.26, subdivision (c)(2), which states that a court shall not terminate parental rights if it found reasonable services were not offered or provided to the parent. He maintains the court should have made such a finding because (1) when his whereabouts were unknown, the court was obligated to set the matter for a six-month review hearing and determine at that review hearing whether M.A.'s whereabouts had become known and (2) if he had been located (which he was), the court had to order reasonable reunification services for him from the date of removal. (§ 361.5, subd. (d); Cal. Rules of Court, rule 5.695(h)(9).) He asserts the court

---

**3**      Pursuant to section 366.26, subdivision (c)(1), the court shall terminate parental rights if it finds the child is likely to be adopted, *unless* one of several enumerated exceptions apply.

could not proceed straight to setting a permanency planning hearing when it found his whereabouts were unknown. We find no reversible error.

M.A. overlooks the fact that the court rejected reunification services for *two* reasons—first, his whereabouts were unknown, but second and more importantly for our purposes, he never attained the status of presumed father. "'In dependency proceedings, "fathers" are divided into four categories—natural [or biological], presumed, alleged, and de facto.' [Citation.] A biological father is one whose paternity is established, but who does not qualify as a presumed father." (*In re J.O.* (2009) 178 Cal.App.4th 139, 146.) "A 'natural father' can be, but is not necessarily, a 'presumed father' and a 'presumed father' can be, but is not necessarily, a 'natural father.' [¶] Presumed father status ranks highest." (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801, fn. omitted.) Presumed fathers are vested with greater parental rights than biological or alleged fathers. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 448-449.)

When a child is removed from a parent's or guardian's custody, pursuant to section 361.5, the court must order DCFS to provide reunification services "to the child and the child's mother and *statutorily presumed father* or guardians." (§ 361.5, subd. (a), italics added.) "[O]nly a presumed, not a mere biological, father is a 'parent' entitled to receive reunification services under section 361.5." (*In re Zacharia D., supra*, 6 Cal.4th at p. 451.) The court has the discretion to order reunification services for a biological father if it determines the services will benefit the child. (§ 361.5, subd. (a).)

Until the time a permanency planning hearing is set, the court should give the parents' interest in reunification precedence over the child's need for stability and permanency. (*In re Zacharia D., supra*, 6 Cal.4th at p. 447.) But once the court terminates reunification services or does not order them, the focus shifts to the needs of the child for stability and permanency. (*Ibid.*) The burden is then on the parent to file a petition pursuant to section 388 to revive the reunification issue. (*Ibid*.) "Under section 388, the petitioner must show by a preponderance of the evidence either changed circumstances or new evidence and that the proposed modification is in the best interests of the child." (*In re Shirley K.* (2006) 140 Cal.App.4th 65, 71.) We will not disturb a

7

court's grant or denial of a section 388 petition unless the appellant shows an abuse of discretion.  (*Ibid.*)

We review a juvenile court's determination of parentage status under the substantial evidence standard.  (*Charisma R. v. Kristina S.* (2009) 175 Cal.App.4th 361, 368, disapproved on another ground by *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 532, fn. 7.)  "To be a presumed father, a man must fall within one of the categories set forth in Family Code section 7611.  Several of the categories relate to the man's status as the mother's husband, or his attempts to marry the mother."  (*In re J.H.* (2011) 198 Cal.App.4th 635, 644.)  Another category permits presumed status when the parents sign a witnessed voluntary declaration of paternity pursuant to Family Code section 7571.  (Fam. Code, § 7611.)  "[U]nder [Family Code] section 7611, subdivision (d), a man may also be deemed a child's presumed father if he 'receives the child into his home and openly holds out the child as his natural child.'"  (*In re J.H., supra*, at p. 644.)

"In determining whether a man has 'receiv[ed a] child into his home and openly h[eld] out the child' as his own ([Fam. Code,] § 7611, subd. (d)), courts have looked to such factors as whether the man actively helped the mother in prenatal care; whether he paid pregnancy and birth expenses commensurate with his ability to do so; whether he promptly took legal action to obtain custody of the child; whether he sought to have his name placed on the birth certificate; whether and how long he cared for the child; whether there is unequivocal evidence that he had acknowledged the child; the number of people to whom he had acknowledged the child; whether he provided for the child after it no longer resided with him; whether, if the child needed public benefits, he had pursued completion of the requisite paperwork; and whether his care was merely incidental."  (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1211.)

Here, substantial evidence supported the court's determination at the adjudication hearing that M.A. was not a presumed father.  At that time, he was merely an alleged father.  There was no voluntary declaration of paternity.  He was not identified as the father on T.D.'s birth certificate.  When the social worker talked to him after T.D.'s birth, he was aware mother had given birth but said he did not go the hospital because he did

8

not have time. He did not believe T.D. was his son and he was uncooperative with the social worker, hanging up on her. The next day, he confirmed his belief that T.D. was not his son after seeing a picture of the child. He said he would attend the detention hearing only to request a paternity test. He did not attend that hearing. He did not notify DCFS when the phone number it had for him stopped working. He did not contact DCFS again until after the adjudication hearing. In sum, his actions were not those of someone who received the child into his home and openly held out the child as his own. (Fam. Code, § 7611, subd. (d).) Among other things, there was no evidence he helped mother with prenatal care or pregnancy expenses, tried to obtain custody of T.D., sought to have his name placed on T.D.'s birth certificate, provided care for T.D., or acknowledged T.D. at all. As an alleged father only, M.A. was not entitled to reunification services. M.A. eventually established biological paternity, but that was not enough to require reunification services either. He still had to show he was a presumed father to change the order of no reunification services, and the vehicle for doing this was his section 388 petition.

The court did not abuse its discretion in denying the section 388 petition. It determined he had not shown a change of circumstances or new evidence, as required by section 388, subdivision (a)(1). The petition's statement that a voluntary declaration of paternity "will be filed with the state" was not evidence. M.A. never did submit the paternity declaration to the court. Moreover, the statement that M.A. was visiting T.D. and "taking steps in order to facilitate the placement" of T.D. in his home did not raise M.A. to presumed father status. Again, no evidence demonstrated what precise "steps" he was taking. For instance, DCFS had given him referrals for parenting classes and counseling, but there was no evidence he had pursued either. The only apparent change was that M.A. had monitored visits with T.D. M.A. did not submit any evidence about these visits beyond the bare statement that he was visiting. In fact, he had visited with T.D. only once at the time he filed the section 388 petition, and his later visits did not go particularly well. For half of his hour-long visits, he either cancelled them entirely or stayed for only half an hour. Courts look to a number of factors to determine whether a

9

man is a presumed father who has received a child into his home and openly held out the child as his own. (*In re T.R., supra*, 132 Cal.App.4th at p. 1211.) Alone, these visits and proof of M.A.'s biological paternity did not convert him into a presumed father. (See *In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1654 ["'some' familial relationship" alone does not confer presumed father status].)

Accordingly, the court did not err in finding M.A. was not entitled to reasonable reunification services. Such a finding was appropriate because M.A. never achieved presumed father status. Further, we are not persuaded by M.A.'s argument that, before setting a permanency planning hearing, the court should have set a six-month review hearing to determine whether M.A. had been located. Assuming for the sake of argument that the court erred in this manner, any error was not prejudicial. DCFS located M.A. well within six months; it located him two days after the adjudication hearing when M.A. contacted DCFS. At that point, the court still had no obligation to order reunification services until he met his burden of proving his presumed father status. (*In re Spencer W., supra*, 48 Cal.App.4th at p. 1652 [burden of proving presumed father status by a preponderance of the evidence rests on alleged father].) M.A. points to section 361.5, subdivision (d), which states that if the court does not order reunification services because the whereabouts of the parent are unknown, "and the whereabouts of [the] parent become known within six months of the out-of-home placement of the child, the court shall order the social worker to provide family reunification services in accordance with this subdivision." But we must read section 361.5, subdivision (d), in conjunction with subdivision (a) of the same section, giving each part effect. (Code Civ. Proc., § 1858.) And according to that subdivision, the only "parents" entitled to reunification services are "the child's mother and statutorily presumed father or guardians." (§ 361.5, subd. (a).) The fact that M.A.'s location was unknown and then became known does not change the analysis.

## 2. *Detriment Finding*

M.A. also contends the court violated his due process rights when it terminated his parental rights without a finding of unfitness and detriment to T.D. M.A. relies on *In re*

10

*Gladys L.* (2006) 141 Cal.App.4th 845 (*Gladys L.*), in which we held that California's dependency system comports with minimal due process requirements because "by the time parental rights are terminated at a section 366.26 hearing, the juvenile court *must* have made prior findings that the parent was unfit. [Citation.] 'The number and quality of the judicial findings that are necessary preconditions to termination convey very powerfully to the fact finder the subjective certainty about parental unfitness and detriment required before the court may even consider ending the relationship between natural parent and child.' [Citation.] The linchpin to the constitutionality of the section 366.26 hearing is that prior determinations ensure 'the evidence of detriment is already so clear and convincing that more cannot be required without prejudice to the interests of the adoptable child, with which the state must align itself.'" (*Id.* at p. 848.)

We reject M.A.'s argument. The court in *Gladys L.* found the father to be a presumed father, and our holding in *Gladys L.* was limited to presumed fathers. (*Gladys L., supra*, 141 Cal.App.4th at p. 847 ["Before a juvenile court may terminate *a presumed father's* parental rights over his child, the juvenile court must find by clear and convincing evidence that the presumed father is unfit." (Italics added.)].) A court is not required to make a particularized finding of unfitness or detriment before terminating the parental rights of a biological father, as opposed to a presumed father. (*In re T.G.* (2013) 215 Cal.App.4th 1, 5; *In re A.S.* (2009) 180 Cal.App.4th 351, 362.) Courts have "consistently held that a biological father's rights are limited to establishing his right to presumed father status, and the court does not err by terminating a biological father's parental rights when he has had the opportunity to show presumed father status and has not done so." (*In re A.S., supra*, at p. 362; see *In re T.G.*, *supra*, at p. 5; *In re Jason J.* (2009) 175 Cal.App.4th 922, 935; *In re Ninfa S.* (1998) 62 Cal.App.4th 808, 811; *In re Sarah C.* (1992) 8 Cal.App.4th 964, 981.) M.A. had the opportunity to show presumed father status and presented the issue by way of a section 388 petition.

Recognizing that he was not a statutorily presumed father, M.A. argues instead that he "acted like a *Kelsey S.* father" and such status entitled him to a finding of detriment before the court terminated his parental rights. In *Adoption of Kelsey S.* (1992)

11

1 Cal.4th 816 (*Kelsey S.*), the California Supreme Court held the statutory distinction between biological fathers and presumed fathers "violates the federal constitutional guarantees of equal protection and due process for unwed fathers *to the extent that* the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest. If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent." (*Id.* at p. 849.) The court emphasized the statutory distinction is "constitutionally invalid *only to the extent* it is applied to an unwed father who has sufficiently and timely demonstrated a full commitment to his parental responsibilities." (*Ibid.*)

*Kelsey S.* fathers, like presumed fathers, are indeed entitled to a detriment finding before the court terminates their parental rights. (*In re T.G., supra*, 215 Cal.App.4th at p. 5.) But M.A. did not act like a *Kelsey S.* father here. Preliminarily, he never raised the issue below. "[A] party seeking status as a father under *Kelsey S.* must be clear he wants to be so declared," and he forfeits the issue on appeal when he fails to raise it in the juvenile court. (*In re Elijah V.* (2005) 127 Cal.App.4th 576, 582; see *In re Jason J., supra*, 175 Cal.App.4th at p. 932.) Even had M.A. not forfeited the issue, we cannot say he came forward at the first opportunity to fully assert his parental rights and responsibilities, but was prevented from becoming a presumed father by the unilateral conduct of mother or some other third party. (*Kelsey S., supra*, 1 Cal.4th at p. 849.) We must consider M.A.'s conduct both before and after T.D.'s birth. (*Ibid.*) As we explained above, M.A. was aware of the pregnancy but did not attend the birth or visit mother and T.D. at the hospital. There was no evidence he helped with pregnancy expenses. He denied being T.D.'s biological father even though mother identified him as such. When DCFS gave him notice of T.D.'s detention hearing, he did not appear, even though he said he would attend solely to request a paternity test. He had essentially no

12

involvement with T.D., except a handful of half hour to hour visits.  Had M.A. raised the issue below, this would not have been sufficient evidence to deem him a *Kelsey S.* father.

## DISPOSITION

The judgment is affirmed.


FLIER, J.

WE CONCUR:


BIGELOW, P. J.


RUBIN, J.

13