Filed 12/12/23  In re S.A. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re S.A., a Person Coming Under the Juvenile Court Law. | |
| | D082538 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. No. NJ13627I) |
| Plaintiff and Respondent, | |
| v. | |
| A.M., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Nadia J. Keilani, Judge.  Affirmed.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

A.M. (Stepfather) appeals the juvenile court's order denying him presumed father status under Family Code[1] section 7611, subdivision (d) and excluding him from the dependency proceeding for his wife's minor daughter, S.A. He contends the juvenile court's order is not supported by substantial evidence. He further asserts that the juvenile court erred by improperly requiring him to show a specific duration that he acted as S.A.'s parent and by improperly assuming his drug use disqualified him from presumed father status. After Stepfather appealed, the Agency moved to dismiss, contending the order was interlocutory and not appealable because it preceded the juvenile court's dispositional order, which the Agency argues is the first appealable order in a dependency proceeding. On the merits, the Agency contends the order is supported by substantial evidence and the court did not err.

We agree with Stepfather that the order denying him presumed father status is appealable as a final judgment against him because it was "the end of the matter" for him in the dependency proceeding. (See *In re Sheila B.* (1993) 19 Cal.App.4th 187, 197 (*Sheila B.*) [predisposition order dismissing petition on the merits is appealable because "[i]t is the end of the matter"].) On the merits, however, we agree with the Agency. The juvenile court's order was supported by substantial evidence, and the record does not compel a finding that Stepfather openly held out S.A. as his own child, as required by section 7611, subdivision (d). We also disagree with Stepfather that the court imposed an improper duration requirement or concluded that Stepfather's drug use disqualified him from presumed father status. Therefore, we affirm.

---

[1] Undesignated statutory references are to the Family Code.

## FACTUAL AND PROCEDURAL BACKGROUND

I.     *Agency Investigation and Proceedings Before Paternity Determination*

Late at night in early February 2023, police found five-year-old S.A. and Stepfather asleep in a vehicle parked at a casino. Stepfather appeared to be under the influence, and officers found bags of fentanyl in his pocket and bags of methamphetamine on the vehicle's floor. Officers also found cans, bleach, and other dangerous chemicals in the vehicle, which were accessible to S.A. and could have caused her serious injury or death. After locating Mother in the casino, police arrested her and Stepfather for child cruelty, among other charges, and detained S.A.

The San Diego County Health and Human Services Agency (Agency), which had previously opened an investigation regarding S.A. after Mother's arrest for shoplifting in late December 2022, continued its investigation. Until Mother and Stepfather's arrests on February 3, 2023, the Agency had been unable to locate them or S.A. A few days later, the Agency filed a juvenile dependency petition on S.A.'s behalf. At the detention hearing, Mother identified M.M. as S.A.'s likely biological father. She asserted, however, that Stepfather qualified as S.A.'s presumed father under section 7611, subdivision (d) because he lived with S.A. in early 2020, provided for her, and acted as her father figure. The juvenile court designated Stepfather and M.M. as alleged fathers and ordered them both to appear at the next hearing.

According to the Agency's detention report, S.A. reported that Stepfather spit on, choked, and physically intimidated Mother, which made S.A. feel "horrible." Mother had a history of substance abuse, criminal activity, and domestic violence, and nine of her children were removed from her care between 2002 and 2017. Mother reported that S.A. was enrolled in

school when she lived in Texas, and she claimed the methamphetamine that police found belonged to Stepfather.

When the Agency first spoke with Stepfather in late February 2023, he asked to be involved in S.A.'s dependency case. He was appointed counsel on March 1, 2023. Like Mother, Stepfather had a child welfare history. In 2017, he lost parental rights to one child, and his other child had lived with his mother since 2016.

The Agency's jurisdiction and disposition report indicated that Mother confirmed M.M. was S.A.'s biological father. M.M. was in prison and had met S.A. only one time on the day he was sentenced. S.A.'s birth certificate did not list either Stepfather or M.M. as parents.

Throughout the Agency's investigation, Mother, S.A., and Stepfather provided differing information about where S.A. had lived and when. S.A., reported that she had lived in a car before the investigation. S.A. also said she and Mother had lived at her grandfather's house in Mexico. Meanwhile, Mother told the Agency that she and S.A. lived with maternal grandfather in Texas until December 2022 and that they moved to San Diego so that S.A. could see Stepfather and Mother could try to visit with her other children. Through counsel, Mother also stated that Stepfather had started living with S.A. in 2020. Her counsel additionally stated that Mother and S.A. were in California from December 2020 until December 2022 but were only in San Diego for the holidays in early 2023 and intended to leave the night Mother was arrested. Mother later reported that she had been living "back and forth" with maternal grandmother in Florida and maternal grandfather in Texas. In contrast, Stepfather claimed he met and began living with S.A. from the age of three in May 2020, but on his parentage inquiry form, he stated that he lived with S.A. from September 2020 to April 2022 and again

4

from December 2022 to her removal. Meanwhile, Stepfather's parole agent reported that Stepfather did not meet Mother until December 2022.

Stepfather and Mother began supervised visits with S.A. in late February 2023. Stepfather asked the Agency if he could bring homemade food that he knew S.A. liked. Mother reported that S.A. was very close to her and Stepfather and that S.A. was "always" asking to return home to them.

In mid-March 2023, the Agency suspended Stepfather's visits after learning of a Criminal Protective Order prohibiting him from contact with S.A. unless the juvenile court ordered otherwise. During the same period, S.A. asked to visit Stepfather and expressed that she would like to live with Mother and him. In the same conversation, S.A. also said that she would like to live with maternal aunt and uncle and her sibling, with whom she was later placed.

On April 5, 2023, Stepfather filed a parentage inquiry form providing information about his relationship with S.A. It indicated that he and Mother married on April 9, 2021, and that S.A. lived with him from September 2020 through April 2022 and from December 2022 until her removal in February 2023. Stepfather confirmed that he had never been ordered to pay child support for S.A., never signed a paper or declaration stating he was S.A.'s father, was not on S.A.'s birth certificate, and that a court never adjudicated him as S.A.'s father. In response to a question asking if he told anyone he was S.A.'s father, Stepfather checked the box for "Yes." When asked to list the names, relationships, and addresses of those individuals, he wrote in "[f]amily, friends," but did not provide any names or addresses. In response to a question asking if he had supported S.A. and in what way, he wrote, "Provided food, shelter, clothing, emotional support and nurturing, teaching her things (alphabet/counting)." He stated that he would present witnesses

5

who knew that he claimed S.A. as his daughter and that she identified him as her father.

At a hearing the same day, M.M. provided the juvenile court with a June 2021 judgment of paternity from the family court. M.M. and Stepfather both requested presumed father status, and Mother joined Stepfather's request. The court deferred the issue of paternity but granted the Agency discretion to permit supervised visitation for Stepfather.

In an interview two weeks later, S.A. said she was happy in her placement but wished she could visit with Stepfather, whom she referred to as her "dad." When the Agency later informed Stepfather he could begin video visits with S.A., he cried and expressed appreciation and excitement. During those twice-a-week video visits with Stepfather and Mother, S.A. often baby-talked, babbled, and made screaming and screeching noises. At a visit in late April 2023, she shouted that she was "done visiting," and she did not want to visit again for 10 days.

The following month, S.A.'s caregivers—maternal aunt and uncle—reported concerns that nearly six-year-old S.A. had trauma related to food because she constantly asked for food, hid food in her room, requested a snack a few minutes after eating a meal, and struggled to understand which meals occurred at which times of day. They also reported S.A. did not know how to write her name correctly, did not know the full alphabet, and was behind in learning numbers. S.A.'s school counselor similarly reported that S.A. was behind academically, had not previously attended school, did not discuss Mother or Stepfather, and instead referred to maternal aunt and uncle as her parents.

During a late May 2023 video visit with Mother, S.A. asked where Stepfather was. Although she referred to him as a parent, she also asked to

speak to her "real dad," M.M. At a June 1, 2023 visit, S.A. expressed sadness that Stepfather had missed a prior visit but informed him that M.M. was her "real dad" and disputed that Stepfather held this position. When asked by Mother, S.A. claimed she disliked M.M. and preferred Stepfather. However, S.A. later told maternal aunt that she liked M.M., wished to visit him, and did not want Mother and Stepfather to know her feelings about M.M.

At a video visit about a week later, Stepfather and S.A. played with Legos. Then S.A. repeatedly told Stepfather and Mother to "go to jail" and hit herself with her fists on the sides of her face.

II.      *Paternity Hearing and Determination*

At the July 19, 2023 contested jurisdiction and disposition hearing, the juvenile court continued its decision on disposition due to outstanding issues under the Indian Child Welfare Act, but it went forward with evaluating paternity and jurisdiction. In support of Stepfather's request for presumed father status, the court received into evidence Stepfather's parentage inquiry form and a screenshot from the sheriff's website estimating Stepfather's release date as August 1, 2023.

Stepfather testified at the hearing that he had met and lived with S.A. since the age of three in 2019 or 2020, and that S.A. called him "dad." When asked what kinds of things he did with S.A. while acting as her father, Stepfather responded that "[s]he had everything she needed" and that he provided a home and emotional support for her. When his counsel asked if he provided food and clothing for her, Stepfather responded, "That little girl had everything." As for family activities, Stepfather testified that they went to the park and he bought toys for S.A. He testified that they loved to draw, worked on the alphabet and numbers, and discussed S.A.'s schooling.

7

On cross-examination, Stepfather testified that when he met S.A. for the first time, she asked if he was her dad, and he and Mother said "no." He explained that he and Mother "hung out and stuff," and S.A. "just decided [he] was going to be her dad." He said "it took a minute for [him] to accept it . . . [b]ut she grew onto [him]." He testified that he lived apart from S.A. and Mother twice—once during a seven-day incarceration and once for about a month.

During closing arguments, Stepfather's counsel asked the juvenile court to elevate Stepfather to presumed father status under section 7611, subdivision (d). The Agency argued that the juvenile court should deny the request under *In re T.R.* (2005) 132 Cal.App.4th 1202 (*T.R.*) because the conditions S.A. was found in, including Stepfather being under the influence of fentanyl and having drugs in the car, showed that Stepfather had acted "contrary to being a father."

After hearing the parties' arguments and considering the evidence, the juvenile court issued its ruling. The court first observed that it "did not hear any testimony as to when [Stepfather] began to see himself in a paternal role to [S.A.]" and that it did not hear any testimony regarding "when he began to see [S.A.] in a way to indicate that he held her out as his own or viewed himself in a parental role to her." The court stated that Stepfather "need[ed] to openly receive [S.A.] into his home" and "openly hold her out as his natural child." It observed "[t]here simply was not enough information provided . . . to be able to put a time line on that."

The court further noted the conditions S.A. was found in, including that drugs were accessible to her while Stepfather was under the influence. The court continued, "I know that [Stepfather's] testimony is that [S.A.] had everything she wanted whenever she wanted . . . [b]ut based on the

8

conditions that she was found under and the fact that [he] was, in fact, charged with felony child cruelty and child abuse, his characterization of how [S.A.] was cared for by him is belied by the facts in this case." The court concluded Stepfather had not met his burden by a preponderance of the evidence and denied his request to elevate him to presumed father status. It then struck Stepfather as an alleged father from the petition, removed him from the proceedings, and ordered his counsel relieved "upon notice of a filing of a notice of appeal" or within 60 days.

Stepfather appealed.

DISCUSSION

I.    *Appealability*

We first address the threshold question of appealability. The Agency argues that Stepfather's appeal must be dismissed as being from a nonappealable interlocutory order because Stepfather appeals from a *pre*disposition order, even though the disposition order is the first appealable order in a juvenile dependency case. We disagree.

Appeals in dependency proceedings are governed by Welfare and Institutions Code section 395, subdivision (a)(1), which provides that "[a] judgment in a proceeding under Section 300 may be appealed in the same manner as any final judgment, and any subsequent order may be appealed as an order after judgment." The juvenile court's disposition order, and not its jurisdictional finding, is generally considered the " 'first appealable order' " in a dependency proceeding. (*In re Nicholas E.* (2015) 236 Cal.App.4th 458, 463.) Nonetheless, appellate courts have concluded that predisposition orders can be appealable where they are sufficiently "final." (See, e.g., *ibid.*; *Sheila B., supra*, 19 Cal.App.4th at p. 197.) That conclusion is consistent with Code of Civil Procedure section 904.1, subdivision (a), which permits an

9

appeal "[f]rom a judgment," defined by Code of Civil Procedure section 577 as "the final determination of the rights of the parties in an action or proceeding."

In *Sheila B., supra*, 19 Cal.App.4th at p. 197, for example, the appellate court concluded that an order dismissing a dependency petition on the merits—despite occurring before the court's disposition order—was appealable because "[i]t [wa]s the end of the matter, and the child goes home." (*Ibid.*) Similarly, the court's order here, which denied Stepfather presumed father status and relieved him of counsel, was "the end of the matter" for Stepfather because it excluded him from the dependency proceeding without further recourse in the juvenile court. (See *ibid.*)

We recognize, as did the court in *Sheila B.*, that allowing an appeal from a predisposition order is not a perfect solution, particularly given the passage of time before an appeal can be concluded and the potential for disruption in the event of a reversal. (See *Sheila B., supra*, 19 Cal.App.4th at pp. 197–198.) But the alternative—waiting until the juvenile court issues a disposition order—is even less attractive. As was the case here, disposition hearings are often continued, sometimes for extended periods. Postponing an appeal until after a disposition order would cause even more delay, making a reversal even more disruptive. Moreover, because Stepfather was excluded from all further proceedings and his court-appointed counsel was relieved, there was no practical way that he could learn when the disposition order had been issued, and at that point, he would not have any counsel to file his notice of appeal.

Accordingly, we conclude the court's predisposition order denying Stepfather presumed father status and excluding him from further

proceedings is appealable, and the Agency's motion to dismiss is denied. We next consider the merits.

II.    *Presumed Father*

    A.    *Applicable Law*

In dependency proceedings, "the premise behind the category of presumed father is that an individual who has demonstrated a commitment to the child and the child's welfare—regardless of whether he is biologically the father—is entitled to the elevated status of presumed fatherhood." (*T.R., supra*, 132 Cal.App.4th at pp. 1211–1212.) Section 7611, subdivision (d) provides that someone is a child's presumed father if he both "receives the child into their home and openly holds out the child as their natural child." It is the burden of the person claiming entitlement to presumed father status to establish these facts by a preponderance of the evidence. (*In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1653 (*Spencer W.*); § 7611, subd. (d).)

When determining whether a person has satisfied the statutory requirements of receiving the child into his home and openly holding out the child as his own, courts have considered a number of factors, including "whether the man actively helped the mother in prenatal care; whether he paid pregnancy and birth expenses commensurate with his ability to do so; whether he promptly took legal action to obtain custody of the child; whether he sought to have his name placed on the birth certificate; whether and how long he cared for the child; whether there is unequivocal evidence that he had acknowledged the child; the number of people to whom he had acknowledged the child; whether he provided for the child after it no longer resided with him; whether, if the child needed public benefits, he had pursued completion of the requisite paperwork; and whether his care was merely incidental." (*T.R., supra*, 132 Cal.App.4th at p. 1211.) No single factor is determinative,

11

and the court may consider all the circumstances in making its decision. (*R.M. v. T.A.* (2015) 233 Cal.App.4th 760, 774 (*R.M.*).)

B.    *Standard of Review*

We review a juvenile court's determination of presumed father status for substantial evidence. (*Charisma R. v. Kristina S.* (2009) 175 Cal.App.4th 361, 368 (*Charisma R.*).) Under the substantial evidence standard, "[w]e must accept as true all evidence and all reasonable inferences from the evidence tending to establish the correctness of the trial court's findings and decision, resolving every conflict in favor of the judgment." (*Id.* at p. 369.)

Because Stepfather bore the burden of establishing presumed father status, and the juvenile court found that he failed to meet his burden, the substantial evidence standard requires him to demonstrate that the evidence compels a finding in his favor. Specifically, the question becomes whether his evidence was (1) uncontradicted and unimpeached; and (2) of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding in his favor. (*Kinder v. Capistrano Beach Care Center, LLC* (2023) 91 Cal.App.5th 804, 811.)

To the extent Stepfather claims that the juvenile court considered impermissible factors in its evaluation, we review his claims de novo.

C.    *Analysis*

Stepfather contends the juvenile court erred by not elevating him to presumed father status under section 7611, subdivision (d). We disagree.

First, the trial court could reasonably have concluded that Stepfather failed to meet his burden of showing that he openly acknowledged S.A. as his own child. Although he checked a box in his parentage inquiry form indicating that he told others he was S.A.'s father, short of vaguely referencing "[f]amily, friends," he failed to identify any of these purported

12

individuals by name, relationship, or address, as the form asked. Nor did he offer any testimony at the hearing that he had held out S.A. as his child or to whom he had done so. (Cf. *Charisma R., supra*, 175 Cal.App.4th at p. 375 [nonbiological parent held out child as her own in birth announcement, online message board for women trying to conceive, and communications with visiting former coworker, the nurse at a medical visit, and strangers in the street].) There was also no evidence that, for example, Stepfather named S.A. as his child on insurance or other paperwork. (Cf. *In re L.L.* (2017) 13 Cal.App.5th 1302, 1314 [evidence sufficient to support court's finding that man held out child as his own where he named child as his own on insurance and employment forms; told family, friends, and strangers that child was his; and filed action to obtain joint legal custody].) For these reasons alone, the evidence did not compel a finding that Stepfather " 'openly and publicly' " acknowledged S.A. as his child. (*Spencer W., supra*, 48 Cal.App.4th at p. 1652.)

Stepfather argues that the juvenile court erred by finding there was "not enough information" as to "when [Stepfather] began to see himself in a parental role to [S.A.]" or "when he began to see [S.A.] in a way to indicate that he held her out as his own." We disagree with Stepfather's contention that the court's comments show it imposed an impermissible "duration requirement" on his relationship with S.A. (See *Jason P. v. Danielle S.* (2017) 9 Cal.App.5th 1000, 1021 (*Jason P.*) [" 'A party seeking to establish he is a presumed parent is not required to show that he acted as a parent to the child for a specific period.' "].) Rather, the court was merely articulating the lack of clarity surrounding the nature of Stepfather's purported parental relationship with S.A. and at what point it came about. Other courts, too, have considered evidence regarding the "timeline" of a purported parental

relationship and the specific periods of time during which an individual "received" a child into his home or as his own. (See, e.g., *In re M.R.* (2017) 7 Cal.App.5th 886, 899 [in concluding substantial evidence supported court's presumed father finding, appellate court recounted specific time periods and dates during which presumed father "received" child into home or visited child].) We see no error in the juvenile court's observation that the evidence of a parental relationship fell short because it was not sufficiently clear and unambiguous. (See *Jason P., supra*, at p. 1023 [under section 7611, subdivision (d), " 'receipt of the child into the home must be *sufficiently unambiguous as to constitute a clear declaration* regarding the nature of the relationship, but it need not continue for any specific duration' " (italics added)].)

Moreover, construing the evidence in favor of the judgment as we must, the record demonstrates other factors, too, weighing against a finding of presumed father status. For example, Stepfather's relationship with S.A. could reasonably be considered only "incidental" to his relationship with Mother. (*T.R., supra*, 132 Cal.App.4th at p. 1211.) " 'Section 7611, subdivision (d) . . . requires . . . "someone who has demonstrated an abiding commitment to the child and the child's well-being" regardless of his relationship with the mother.' " (*W.S. v. S.T.* (2018) 20 Cal.App.5th 132, 144-145.) Yet, Stepfather offered no evidence of any instances during which he spent time with S.A. on his own or cared for her outside of his relationship with Mother. (See *R.M., supra*, 233 Cal.App.4th at p. 777 [person seeking presumed parent status under section 7611, subdivision (d) must have a fully developed parental relationship with the child; a caretaking role and/or romantic involvement with the child's parent is insufficient].)

14

Stepfather sees the evidence differently. But each of his arguments requires that we impermissibly reweigh the evidence against the juvenile court's order or construe inferences in his favor. That is not our role when reviewing an order for substantial evidence. (*Charisma R., supra*, 175 Cal.App.4th at p. 369 [" 'It is not our task to weigh conflicts and disputes in the evidence,' " and we instead " '[m]ust accept as true all evidence and all reasonable inferences from the evidence tending to establish the correctness of the trial court's findings and decision, resolving every conflict in favor of the judgment.' "].)

As one example, Stepfather emphasizes evidence that he gave S.A. "everything she needed," including "food, shelter, clothing, emotional support and nurturing." Yet, evidence also showed that after S.A. was detained with her caregivers, she constantly asked for food, hid food in her room, requested a snack a few minutes after eating a meal, and struggled to understand how mealtimes worked. Thus, the juvenile court could reasonably infer Stepfather had not, in fact, given S.A. "everything she needed" as he claimed—especially considering the circumstances surrounding the discovery of Stepfather asleep and under the influence in a vehicle with five-year-old S.A. and easily accessible bags of fentanyl and methamphetamine and dangerous chemicals. (See *Charisma R., supra*, 175 Cal.App.4th at p. 369 [" 'Even in cases where the evidence is undisputed or uncontradicted, if two or more different inferences can reasonably be drawn from the evidence this court is without power to substitute its own inferences or deductions for those of the trier of fact, which must resolve such conflicting inferences in the absence of a rule of law specifying the inference to be drawn' "].)

In a related argument, Stepfather asserts the juvenile court erred by adopting the Agency's argument at the hearing, based on *T.R., supra*,

132 Cal.App.4th 1202, that Stepfather should be "disqualified" from presumed father status because of his drug use. While we agree that "a parent need not be a perfect parent to be found to have received a child into his . . . home" (*Jason P., supra*, 9 Cal.App.5th at p. 1023), we disagree with Stepfather that the juvenile court required such perfection of him or that the record shows the court considered his drug use as a basis to disqualify him from presumed father status. On the contrary, the juvenile court discussed Stepfather's drug use and "the conditions that [S.A.] was found to be living under" to explain why it did not find credible his testimony that S.A. had "everything she needed." Moreover, there is simply no indication that, in reaching its decision, the juvenile court relied on the Agency's arguments under *T.R.*

As another example, Stepfather points to evidence showing he helped S.A. with learning the alphabet and numbers, and discussed school with her. But again, other evidence undermined that testimony. S.A. told the Agency that she had not been to school in a long time, and her school counselor reported that S.A. had not previously attended school until her placement with maternal aunt and uncle. Evidence also showed that S.A. could not write her name, did not know the alphabet, and was behind in learning numbers. Accordingly, the court was not required to find Stepfather's testimony credible. Although Stepfather suggests that S.A.'s learning deficits could be explained by a potential learning disability or other obstacle, we must construe all inferences and conflicts in the evidence in favor of the court's order, not in favor of a finding for Stepfather.

Stepfather further highlights evidence that S.A. called him "dad," wanted to live with him, and asked to see him for visits. Other evidence, however, indicates that S.A. similarly referred to her maternal aunt and

16

uncle as her parents and to her biological father as her "real dad." Although evidence surrounding S.A.'s view of Stepfather as her parent and Stepfather's view of S.A. as his child was relevant to the paternity determination, the totality of the evidence did not compel a finding in his favor on presumed father status. We cannot conclude the juvenile court erred in finding such evidence insufficient to show Stepfather carried his burden under section 7611, subdivision (d). (See *R.M., supra*, 233 Cal.App.4th at p. 774 [no single factor is determinative, and the court may consider all the circumstances in making its decision.].)

For the same reasons, we are unpersuaded by Stepfather's arguments regarding when he claims to have lived with S.A. Stepfather contends it is "undisputed" that S.A. lived with him and Mother from 2020 through her detention in February 2023. Although Stepfather testified to having lived with S.A. beginning in May 2020 through her removal, the record is replete with evidence contradicting that timeline, including Stepfather's own statement in the parentage inquiry form that he lived with S.A. from September 2020 to April 2022 and again from December 2022 until her removal. Meanwhile, S.A. reported that she and Mother lived at her grandfather's home in Mexico. Mother, too, claimed a number of contradictory timelines and residences, including that she and S.A. had lived back-and-forth with maternal grandmother in Florida and maternal grandfather in Texas, including from December of 2020 to December 2022—without mentioning that Stepfather lived with them during these periods. Accordingly, the juvenile court could have discounted Stepfather's testimony and inferred that the evidence was too conflicting to determine whether, when, or for how long Stepfather lived with S.A. (*Charisma R., supra*,

175 Cal.App.4th at p. 368 [substantial evidence review requires resolving evidentiary conflicts in support of judgment].)

For all these reasons, we conclude substantial evidence supports the court's findings that Stepfather had not received S.A. into his home and had not openly held her out as his own child. We further conclude that the juvenile court did not consider impermissible criteria in making this determination.[2]

DISPOSITION

The July 19, 2023 order is affirmed.

BUCHANAN, J.

WE CONCUR:

DATO, Acting P. J.

DO, J.

---

[2] Because we affirm, we need not address Stepfather's additional argument that the juvenile court on remand must consider whether S.A. would suffer detriment by only recognizing two parents under section 7612, subdivision (c) before determining whether S.A.'s biological father's judgment of paternity would have rebutted Stepfather's presumed parent status under section 7612, subdivision (d). (See *id.*, subd. (c) ["a court may find that more than two persons with a claim to parentage under this division are parents if the court finds that recognizing only two parents would be detrimental to the child"]; *id.*, subd. (d) ["Unless a court orders otherwise after making the determination specified in subdivision (c), a presumption under Section 7611 is rebutted by a judgment establishing parentage of the child by another person"].) As Stepfather concedes in his reply brief, the juvenile court's finding that Stepfather did not qualify for presumed father status meant that a detriment analysis under section 7612, subdivision (c) "would have been purely academic."